FARRELL et al. v. BOSTON & M. CONSOL. COPPER & SILVER MIN. CO.

(Circuit Court, D. Montana.   January 31, 1903.)

No. 642.

1. PATENTS—INVENTION—PROCESS FOR REDUCTION OF COPPER.

The Manhes patent, No. 470,644, for the process of reducing commercial or pig copper from copper matte, and a converter for applying such process, which consists essentially in burning out the impurities in copper matte by means of radial jets of atmospheric air injected into the molten mass under pressure while it is in the converter, is void for lack of invention as to both claims, being the same process and essentially the same converter invented and patented by Bessemer, and used in the making of steel from pig iron, applied to a different but analogous subject, without any change in the manner of operation, or producing any result which is substantially distinct in its nature.

In Equity.

George A. Clarke and H. A. Seymour, for complainants.
Forbis & Evans and Elmer P. Howe, for defendant.

KNOWLES, District Judge.   This is an action brought by Farrell and Migeon to recover damages and an accounting and an injunction for the alleged infringement of a certain patent granted by the United States to one Pierre Manhes, the same being No. 470,644, and dated March 8, 1892.   The patent has two claims, and they are as follows:

"I claim as my invention: (1) The process of reducing commercial or pig copper from copper matte, consisting in charging the matte in a molten state into a converter, forcing radial jets of air uniformly and continuously through the charge of molten matte, and causing the heat produced by the combustion of the sulphur and iron in the matte to separate the foreign substance from the metallic copper contained therein, allowing the metallic copper as it is separated from the matte to settle below the action of the air jets, and removing the chilled metallic copper as it forms around and obstructs the inner ends of the tuyères, and thereby insure the maintenance of a continuous and practically uniform distribution of air throughout the molten matte, and continuing the operation until the metallic copper contained in the charge has been separated therefrom, and then removing the copper from converter, substantially as set forth.   (2) A converter for reducing commercial or pig copper from copper matte, having a wind-belt encircling the converter above its bottom, a series of tuyères extending through the lining of the converter and communicating at their outer ends with the wind-belt, and removable stoppers located in the outer walls of the wind-belt and in alignment with each one of said tuyères, whereby a drift bar may be inserted successively through said tuyères to remove obstructions from their inner ends, substantially as set forth."

The complainants claim that both the process above described and the converter used are new and novel; that said Pierre Manhes was the original, first, and sole inventor thereof, and that the same was not known or used by others in this country, and not patented or described in any printed publication in this or any foreign country before his invention or discovery thereof, and which was not in public use or on sale in this country for more than two years prior to his application for letters patent of the United States.

The defendant in its answer denies that said Pierre Manhes was the original, first, and sole inventor of the alleged new and useful improve-

ment in the process for reducing commercial or pig copper from copper matte, and of said alleged new and useful improvement in converters for copper ores, as set forth and described in said letters patent; also denies that said alleged improvements were not known or used by others in this country before the supposed invention thereof by said Manhes; also further denies that said alleged improvements were not patented or described in printed publications in this or any foreign country before the supposed invention and discovery thereof by the said Manhes, as alleged in the bill of complaint; also further denies that said alleged improvements were not in public use or on sale in this country for more than two years prior to the application for said letters patent of the United States therefor; denies infringement; avers a failure of the patentee and the complainants to comply with the requirements of section 4900 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3388] in respect to the marking of their converters in the manner and form as therein prescribed; avers anticipation by prior patents; also avers public use for two years or more; expiration of the patent in suit by reason of the provisions of section 4887 of the Revised Statutes; also sets up the defense of laches. The general replication was filed to this answer, and the record is now before the court.

The first question presented is, was the process specified in Manhes's patent a new and useful one? As stated in the patent, the process claimed to be new and useful consists: (1) In charging matte in a molten state into a converter; (2) forcing radial jets of air uniformly and continuously through the charge of molten matte; (3) allowing copper, as it is separated from the matte, to settle below the action of the air jets; (4) removing the chilled metallic copper as it forms around and obstructs the inner ends of the tuyères; (5) continuing the operation until the metallic copper contained in the charge has been separated therefrom; (6) and then removing the copper from the converter, substantially as set forth.

In the United States patent No. 16,082, granted to Henry Bessemer, November 11, 1856, and entitled "Improvements in the Manufacture of Iron and Steel," the following statement is made:

"My invention consists in the decarbonization or partial decarbonization and refinement of the crude iron which is obtained in a fluid state from the blast furnaces in which the iron ore is usually smelted, or the decarbonization and refinement of crude pig iron or finery iron, by first smelting the pigs of crude iron or the plates of finery iron in any suitable furnace, so as to obtain fluid metal for the purpose of being treated by my improved means, and which consists, first, in running the fluid iron into a close or nearly close vessel or chamber, formed by preference of iron, and lined with fire bricks or other slow conductor of heat. When the chamber or vessel is about filled, I blow or force into and among the fluid metal numerous small jets of atmospheric air in a cold or in a previously heated state, or I use any other gaseous fluid or matter containing or capable of evolving sufficient oxygen to cause the combustion of the carbon contained in the iron, and thereby to keep up the required temperature during the process. The size or number of the jets or tuyère pipes by which the air or other gaseous matters are conducted into the molten metal should be proportioned to the quantity of fluid metal operated upon at a time, and may also vary with the condition or quality of the metal. * * * When using foundry iron of the quality known as No. 2, I run one ton of it into the converting vessel, in which it rises to a height of about one

foot above the orifices of the tuyère pipes. I then force into the fluid metal atmospheric air, in its natural or unheated state, under a pressure of about ten pounds per square inch, and I employ from six to twelve tuyère pipes for the distribution of the air, the united area of the tuyères being equal to two square inches."

In this patent Bessemer also states:

"I have also found that a single outlet in each tuyère block will answer well in practice, as represented in end elevation at Fig. 11, and in longitudinal section at Fig. 12, where a single parallel passage, y, leads direct from the pipe, u, into the metal, as these passages sometimes get obstructed. I fit a screw-plug, q, at the back of the elbow of the pipe, u, which plug may be removed if required, while the apparatus is in use, and a steel rod introduced at the aperture, which should be thrust entirely through the tuyère block, and any accidental accumulation of matter will thus be removed."

In the United States patent No. 49,052, granted to Bessemer, July 25, 1865, and in the United States Patent No. 51,398, granted to Bessemer, December 5, 1865, the process of converting pig iron into steel by the pneumatic process, the injection of atmospheric air into the molten mass in the converter is especially described and referred to. In the United States patent No. 33,446, granted to Nystrom, October 8, 1881, there is a reference to, and a description of, the pneumatic process. In the British patent No. 1,131, granted to Hollway, March 21, 1878, the pneumatic process is fully referred to and described. This process seems from that time on to have acquired a special and distinctive name or term in the nomenclature of the art, to wit, "Bessemerizing"; and, so far as I can gather the definition of the term, its accepted meaning in the metallurgical art is the refining of crude or impure metals by burning out such impurities, in connection with atmospheric air, hot or cold, injected under pressure into a converter or other suitable vessel. Mr. Hollway specifically refers to a Bessemer converter, and also uses the term "Bessemerizing." In a part of his specifications set out in his patent he says:

"In carrying out my object I employ a furnace, which might be a modification of the Bessemer converter. * * * I drive in air at or near the bottom of the furnace, and by increasing or decreasing the quantity I regulate the temperature of the operations."

In his French patent No. 135,782, granted to Pierre Manhes, May 29, 1880, he says:

"This process is based upon chemical reactions of the same kind as those which take place in the treatment of iron smelting by the Bessemer process, and though the operation can be carried on in a furnace of any kind, such as I employ by preference the Bessemer converter as is used in the metallurgy of iron. * * *"

The patent in this case is for a process for the direct treatment of the minerals of copper and coppery materials. The process as described is similar to the process for converting iron into steel under the Bessemer patent of 1856. In the last part of his said French patent Manhes says:

"My process characterized by the suppression of all previous roasting of the sulphurous minerals, and by the facility of the operation upon all coppery materials. sulphurous copper, is then essentially based on the combustion and oxidation of the sulphur and iron by the forced passage of a blast of cold air, or better warmed, and under sufficient pressure to traverse through the

mass of copper in fusion, either in a Bessemer converter or in any other analogous apparatus or convenient furnace. * * *"

In his first certificate of addition to this patent under the French law, dated 31st May, 1880, Manhes says:

"I have said in the description of my principal patent that the operation making the object of my invention can be made in a furnace or apparatus whatever appropriate, but of preference in the Bessemer converter. This apparatus is in effect that in which the operation succeeds the best, and where it is most easily performed. I intend, then, to reserve especially the employment of the Bessemer converter, fixed, or better oscillating, as a new application, which is one of the principal characteristics of my invention."

In his third certificate of addition to his French patent above named, under date of 9th February, 1881, Manhes again expresses his preference for Bessemer converters in which to perform his process, and makes this statement:

"To measure that which effects the production of the copper metallurgy, this metal, in virtue of its density, gains the bottom of the apparatus and assembles itself there. But if, in the converter employed for the metallurgy of iron, the blast passes out from the bottom of the apparatus by vertical tuyères, it is necessary at the last of the operation to traverse the metallic copper, which, containing no more combustibles, solidifies itself by the coldness in contact with the blast, and which latter brings about the obstruction of the tuyères. * * * It can be varied in its details, but it consists simply to leave above the level of the orifices of the tuyères a fire space where the metallic copper assembles itself, in the measure that it produces itself, and where it is in shelter from the contact of the cold blast, the capacity of that space coming always to be level, and even to that which must be occupied by the metallic copper at the last of the operation. Ordinarily, to carry out that design I replace the vertical tuyères, which open out at the bottom of the ordinary Bessemer converter, by horizontal tuyères placed all around the converter, and opening out into the interior at the desired height above the bottom of the apparatus." (The above is the translation from the original French patent as it appears in the record.)

Manhes' Russian patent of 1886 is, in effect, the same as his German patent of 1881.

It would seem very clear that Manhes used the same process in converting copper matte into commercial or pig copper that Bessemer many years before had used in the conversion of molten iron into steel; and the question fairly arises as to whether this is what is denominated a new invention, or is it simply using an old, well-known process for a new use.

The next claim in the Manhes patent is that of an alleged improvement in converters. Looking at the patent for converters, I find that all of the claims of Manhes as to this alleged improvement have been anticipated and exist in other converters, and have so existed long prior to the alleged improvement of Manhes. In the description of the Bessemer converter of 1856, as hereinbefore given, it is provided that the tuyères may be punched while the apparatus is in use, for the purpose of removing accidental accumulations of matter at the inner ends of the tuyères, and that this may be accomplished by the introduction of a steel rod by thrusting the same through the tuyères. In the Bessemer patent of December 5, 1865, I find a pear-shaped converter with a subsidence chamber and side-blown tuyères. The ninth claim of this patent is as follows: "A converting vessel provided with

a line of tuyères placed through the sides of the vessel, substantially as and for the purposes set forth." In the British patent granted to Parry, April 25, 1865, I find a side-blown converter. In the French patent granted to Petin & Gaudet, December 18, 1862, I find there is described a mode of opening tuyères which have become choked up. In this a metal bar or spindle is thrust into and through them for the removal of the obstructions at their inner ends, without causing the work to stop.

It has been common and almost universal in the construction of blast furnaces to provide them with tuyères so arranged and located as to facilitate and permit the ready removal of any accidental obstructions which may have become attached to the inner ends of the tuyères, and this was effected by means of iron or steel bars thrust through them. A very familiar and significant instance of this is to be found in the British patent granted to Brewer, January 2, 1882, in which the following language is used:

"The object of this invention is to remove obstructions from the nose of the tuyère or air passages in blast furnaces. It is well known that one of the difficulties metallurgists and others have to contend with in the use of blast furnaces is the tendency of the metal or ores under treatment to clog around and ultimately close the openings in the nose of the tuyère or air passages. This is especially felt in the treatment of copper ores and pyrites in furnaces where the air is passed through the molten metal, and it is specially although not wholly for the purpose of removing or remedying this difficulty that this invention is designed. The invention consists in providing a rod or poker for each air passage in the tuyère, long enough to pass quite through such passage, and push away any obstructions that may have gathered in or in front of its nose. * * *"

Again:

"Having thus described the nature of this invention and the manner of performing same, I would have it understood that the application of this invention is not confined to any particular kind of construction of blast furnace, nor to any particular means of giving motion to the contrivance, nor to its application for any particular process; but I claim, first, the construction of blast furnaces with a poker or rod for each air channel through which the blast passes, such poker or rod being sufficiently long to pass quite through, and push away any obstructions that may have gathered in or in front of such passages. * * *"

The only difference between this mode of removing obstructions from tuyères consists, possibly, in a contrivance for thrusting a poker or rod through all of the tuyères at once and the thrusting of one poker or rod through one tuyère at a time; the object being, in both cases, to remove obstructions at or on the nose of the tuyère.

The question as to the patentable novelty of the second claim of the patent in suit was examined into and passed upon by Mr. B. R. Catlin, an examiner in the Patent Office, in the following language: "It is universal practice in the art of melting ores to clear the tuyères by inserting bars or rods in the manner described by applicant." This language is not controverted in the further proceedings for obtaining the patent in suit. It would seem that the Patent Office claimed that the principal invention of Manhes was the driving into the molten mass of the chilled copper which had accumulated at the inner ends of the tuyères. It is stated in the final ruling of the examiners, and the

wording of the patent sustains them, that the poker or steel bar used for this purpose was no part of the Manhes invention. I find, therefore, that the knocking off or removal of obstructions from the inner end or nose of a tuyère, by means of a drift bar, was usual in the smelting of metals and ores.

The question then arises also in relation to this second claim, as to whether it is not an old appliance devoted to a new or analogous use or operation. In the case of Pennsylvania R. R. Co. v. Locomotive Truck Co., 110 U. S. 490, 4 Sup. Ct. 220, 28 L. Ed. 222, the Supreme Court, by Justice Gray, says:

"It is settled by many decisions of this court, which it is unnecessary to quote from or refer to in detail, that the application of an old process or machine to a similar or analogous subject, with no change in the manner of application and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated."

In the opinion in this case a decision of the Court of Queen's Bench is cited, in which it was held—

"That the finishing of yarns of wool or hair by a process previously applied to yarns of cotton and linen, by subjecting them, while distended and kept separate, to the action of rotary beaters or burnishers, by which they could be burnished or polished on all sides, was not the subject of a patent, because, as Lord Campbell said, in order to sustain a patent for the application of an old process to a new purpose there must be some invention of the manner in which the old process is applied. Here there is no novelty in the mode of application, but merely the application of a known process by a known means to another substance."

Again, it was said, quoting from an English case: "The application of a well-known tool to work previously untried materials or to produce new forms is not the subject of a patent."

In Dreyfus v. Searle, 124 U. S. 64, 8 Sup. Ct. 392, 31 L. Ed. 352, it was held by the Supreme Court that a patent for an apparatus for aging wines was not valid because it had been before used in the same way for heating another liquid.

In Crescent Brewing Co. v. Gottfried, 128 U. S. 169, 9 Sup. Ct. 87, 32 L. Ed. 390, it is said by the Supreme Court that in reference to both the Cochrane and Slate patents and the Pewterers blast apparatus the patentees have at most merely applied an old apparatus to a new use without any change of its constituent elements, or of its mode of operation, and this was held not to be the subject of a patent.

In Smith v. Nichols, 21 Wall. 118, 22 L. Ed. 566, it is said:

"A patentable invention is a mental result. It must be new, and should be of practical utility. Everything within the domain of the conception belongs to him who conceives it. The machine, process, or product is but its material reflex and embodiment. A new idea may be ingrafted upon an old invention, be distinct from the conception which preceded it, and be an improvement. In such case it is patentable. * * * But a mere carrying forward, or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way, by substantially the same means, with better results, is not such invention as will sustain a patent. These rules apply alike, whether what preceded was covered by a patent or rested only in public knowledge and use. * * *"

This view was affirmed in Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267. Other decisions could be cited to the same effect.

The great step of the alleged invention of Manhes is the removal or burning out of the impurities contained in copper matte by means of radial jets of atmospheric air injected into the molten mass under pressure. This is the same process confessedly invented by Bessemer and patented by him in the United States in 1856 and 1865. The only difference in the two processes adopted, the first by Bessemer and the other by Manhes, is that the impurities in the molten pig iron are so eliminated as to make steel, and the other is the elimination of the impurities contained in copper matte and the production of commercial or pig copper. If this is not applying an old and well-known process to a new use, I am unable to comprehend the matter.

The charging of the molten material into a converter, as will be seen, is a part of the Bessemer process. The only difference between the two operations consists in the one being molten pig iron and the other molten copper matte.

The third step in the so-called Manhes process is clearly illustrated in the drawings accompanying the Bessemer United States patent No. 51,398, granted December 5, 1865, in which a drawing of the converter shows the existence of a subsidence chamber, or, at least, substantially develops and clearly conveys such idea.

The fourth step in the so-called Manhes process is identical with the step set forth in the Bessemer United States patent No. 16,082, granted November 11, 1856. It was stated in the argument of this case that this matter was old and forgotten, and not put into practical use in the Bessemer converter. It is very evident, however, that Manhes was well acquainted with the Bessemer and other patents for converters.

The fifth step in the Manhes process is identical with the Bessemer process for producing steel, in that the operation is continued until the finished product is obtained.

The sixth step in the process described in the patent in suit is the same as in the Bessemer process.

There is some claim that the removable plug in the Bessemer converter is a screw plug, while the other is a friction plug. It cannot be seriously claimed that there is much, if any, difference in this; one is an equivalent for the other.

There was some claim that the knocking off of the chilled copper from the inner ends or noses of the tuyères is the essential and novel step in the process. It would seem that this is merely a mechanical operation, and not a part of a process. As a mechanical appliance it was old and well known in the smelting art, long before the alleged invention of Manhes, to punch tuyères by means of drift bars for the removal of obstructions at the inner ends or noses thereof.

For the reasons hereinbefore given, I hold that both claims of the patent in suit are invalid.

I am supported in my views by a recent decision delivered by Judge Wallace in the United States Circuit Court for the Second Judicial Circuit and Southern District of New York, in the case of Franklin Farrell et al. v. The United Verde Copper Co., 121 Fed. 551, in which

the validity of the patent in suit was also drawn in question, and in that case held to be void for the want of novelty. A copy of the opinion of the court in Franklin Farrell et al. v. The United Verde Copper Company was received by me after this opinion was written.

Having passed upon the merits and the validity of the claims of the patent, and held the same to be invalid, I do not deem it necessary to pass upon the other defenses interposed by the defendant herein.

The complainants' bill is dismissed, with costs.