GENERAL ELECTRIC CO. et al. v. WIL-
LEY'S CARBIDE TOOL CO. et al.

Equity No. 7392; Civil No. 432.

District Court, E. D. Michigan, S. D.
July 11, 1940.

Supplemental Opinion July 19, 1940.

Bulkley, Ledyard, Dickinson & Wright.
of Detroit, Mich. (by Glenn D. Curtis, of
Detroit, Mich.,) and Watson, Bristol, John-
son & Leavenworth, of New York City (by
Lawrence Bristol and Charles P. Bauer,
both of New York City), for plaintiffs.

Barnes, Kisselle, Laughlin & Raisch, of
Detroit, Mich. (by Arthur Raisch, of De-
troit, Mich.), for defendants.

TUTTLE, District Judge.

This is a suit for patent infringement.
The patents claimed to be infringed, ar-
ranged in order of filing dates, are as fol-
lows:

Karl Schroter, Reissue No. 17,624, re-
issued March 18, 1930, original No. 1,549,-
615, issued August 11, 1925, application
October 31, 1923;

Karl Schroter, No. 1,721,416, issued July
16, 1929, application April 26, 1926;

Samuel L. Hoyt, No. 1,843,768, issued
February 2, 1932, application April 6,
1927;

Benno Strauss, No. 1,812,811, issued
June 30, 1931, application April 14, 1927;

Emery G. Gilson, No. 1,756,857, issued
April 29, 1930, application April 28, 1927;

George F. Taylor, No. 1,996,598; issued April 2, 1935, application April 23, 1929.

The first five of these patents relate to the same alloy and/or methods of manufacturing it, which alloy is used principally for wire drawing dies and as a tip for metal cutting tools. Of the patents in suit, the alleged invention covered by the Schroter reissue patent No. 17,624 was first in time. Schroter proposed to mix pulverized tungstic carbide containing from 3 to 10% carbon with not more than 10% of a finely divided metal from the iron group (iron, cobalt and nickel), press these mixed powders while cold into a body, and then heat the pressed body to sinter the same. Schroter suggested suitable sintering temperatures between 1500 and 1600° C. These sintering temperatures are above the melting point of the iron group metal and below the melting point of the tungstic carbide. Thus, the iron group metal melts, takes some of the tungstic carbide into solution and consolidates, binds, or cements the tungstic carbide particles together. This Schroter reissue patent does not disclose that this alloy is suitable for cutting tools or for wire drawing dies. As to the usefulness of the alloy claimed in the Schroter reissue, nothing is stated except that the "alloy is suitable for making working implements of various sorts and which is particularly suitable for making hones".

Having limited himself in this Schroter reissue patent to an alloy or sintered composition containing 10% or less of iron group metal, Schroter's second patent, No. 1,721,416, covers exactly the same alloy as the Schroter reissue except that the iron group metal content covers the field left open by the Schroter reissue, namely, the entire range above 10% of the composition.

The Hoyt patent No. 1,843,768 came next in point of time. Hoyt has claims for both product and process. It covers the composition of both the Schroter patents, but instead of cold pressing the powders into a body and then sintering the body, Hoyt presses the mixture of tungsten carbide and iron group metal powders and simultaneously heats the mixture to its sintering temperature.

Strauss No. 1,812,811 covers the same method for making the alloys of both the Schroter patents, but adds the step of mixing the tungsten carbide and iron group metal powders by ball milling for fifty hours or more.

Gilson No. 1,756,857 is for a process, and differs from Hoyt in but one respect, namely: Gilson mixes powdered tungsten, powdered carbon, and a powdered metal from the iron group, and then simultaneously presses and heats the three powders to sintering temperature, whereas Hoyt uses the two powder method, namely; a mixture of powdered tungsten carbide and a powdered iron group metal which are simultaneously pressed and heated to sintering temperature. Gilson's product or alloy is exactly the same as that of Hoyt and the two Schroter patents.

Taylor No. 1,996,598 is for a product and process. It relates to a diamond impregnated abrading tool. Taylor takes the composition of the two Schroter patents, namely; tungsten carbide powder and an iron group metal powder, mixes these with diamond powder and then simultaneously presses and heats the mixture to its sintering temperature according to the Hoyt process. The resulting product consists of a legion of fine tungsten carbide particles and diamond particles which are bound or cemented together by the iron group metal.

For certain purposes, cemented tungsten carbide is the best cutting material known today. Tungsten carbide is a chemical combination which exists in two forms: $WC$, wherein one atom of tungsten has chemically reacted with one atom of carbon to form a molecule, and $W_2C$, wherein two atoms of tungsten have chemically reacted with one atom of carbon to form a molecule. Both $WC$ and $W_2C$ are known as tungsten carbide. In the chemical compound $WC$ the carbon forms 6.12% by weight of the tungsten carbide, whereas in $W_2C$ the carbon forms 3.15% by weight of the tungsten carbide. One of the common and successful ways of making tungsten carbide is by heating tungsten powder and carbon powder in a furnace having a hydrogen atmosphere at a temperature of about 1550° C. If more than 6.12% of carbon is added to the mixture of tungsten and carbon powder, then the carburized tungsten will contain $WC$ plus free carbon. If the mixture of tungsten powder and carbon powder contains less than 3.15% of carbon, then the final product will contain $W_2C$ plus some free tungsten. Schroter's preferred carburized tungsten contains 7% carbon, that is, $WC$ plus .88% free carbon. Schroter suggests a carbon range in his carburized tungsten of from 3 to 10%. Thus, at the upper end of the carbon range

one would obtain tungsten carbide plus approximately 4% free carbon. At the lower end of the range one would obtain $W_2C$ plus a small amount of free tungsten.

The best cutting and abrading material for a cemented Tungsten carbide tool is WC, that is, tungsten carbide having a carbon content of 6.12%. $W_2C$ is not as desirable as WC because it is not as hard as WC. To obtain optimum results neither free carbon nor free tungsten is desirable. The sintered composition of tungsten carbide and iron group metal is commonly referred to as "cemented tungsten carbide", that is, the iron group metal cements or binds together the tungsten carbide particles. The plaintiffs use cobalt (one of the iron group) as their binder metal, whereas the defendants use nickel (another one of the iron group) as their binder metal.

Tungsten carbide is a hard, brittle substance. It is not as hard as diamond but compares favorably in hardness with the diamond and is, of course, considerably cheaper. The three members of the iron group (iron, nickel and cobalt) are tough, relatively soft metals. Thus, in the finished composition, tungsten carbide gives the composition hardness and the binder metal of the iron group gives the composition toughness. Both hardness and toughness are essential in the metal cutting tools. Cemented tungsten carbide has about half the toughness (transverse rupture strength) of high speed tool steel, but is considerably harder and is considerably superior as a cutting material. Due to its weakness, however, the cemented tungsten carbide is merely used as the cutting tip of a cutting tool. The tip is copper brazed on a steel shank. The cemented tungsten carbide tip is set into the steel shank so that it is supported on its bottom and two of its sides by the steel shank which decreases breakage of the tip, which otherwise would result from the weakness of the material. When used as a wire drawing die, only the nib (the wear surface immediately surrounding the opening) of the die is made from cemented tungsten carbide, the nib being surrounded by a steel casing which supports and reinforces the cemented tungsten carbide nib.

In making commercially successful cemented tungsten carbide, numerous detail steps not disclosed or claimed by any of the patents in suit are necessarily carefully followed, each of which is vitally important in obtaining the superior cutting tool material as we know it today. These details are too numerous to set forth in entirety but a few will be mentioned. To obtain commercially good tools of different hardness and toughness, it is essential to use WC of different degrees of fineness and to vary the percentage of binder metal. The hardness of the tool is inversely proportional to the particle size of the tungsten carbide. To obtain a tool having a given toughness, the amount of binder metal required increases with decreasing grain size. In reducing tungstic oxide (the form in which tungsten usually occurs in nature) to obtain tungsten powder, it is important that the particle size of the tungsten powder be exceedingly fine. Such exceedingly fine tungsten powder can be obtained in the reduction of tungstic oxide to powdered tungsten only by carefully following a highly refined technique.

Similarly, in carburizing the tungsten to form tungsten carbide (WC), exact proportions of tungsten powder and carbon powder must be mixed and introduced into the furnace in order to obtain the tungsten carbide (WC 6.12% carbon). In forming tungsten carbide, time and temperature are important as well as the purity of the tungsten powder and carbon powder (lampblack) used. The tungsten powder as well as the tungsten carbide powder, to prevent oxidation and other harmful changes, should preferably be stored under conditions wherein the temperature and relative humidity of the atmosphere are carefully controlled. The mixing of the tungsten carbide powder and the binder metal must be carefully controlled to avoid introduction of impurities into the mixture. In cold pressing the mixed tungsten carbide and iron group metal powder, definite pressures are used depending upon the composition of the mix and the final product desired. Preparatory to cold pressing, paraffin is intimately mixed with the tungsten carbide and iron group metal powders to prevent stratification of the powders during cold pressing, the pressures ranging from fifteen to thirty tons per square inch. If the powders stratify during cold pressing, then cracks or fissures result in the final sintered product which renders it useless. The compressed body is sintered under very carefully regulated temperature and time, all dependent upon the particular percentages of the constituents in the body. The manner of introduction of the pressed body into the sintering furnace is important,

that is, the temperature of the body must be raised in carefully graduated stages to the final or top sintering temperature and the body maintained at this top temperature for a carefully determined period and the temperature of the body then reduced through carefully graduated stages, all consuming a period of several hours and varying with different compositions. This carefully refined technique required in the preparation and sintering of the metal powders (a few details of which are mentioned above) must be carefully borne in mind in evaluating the Schroter patents. The meager information contained in these six patents, all combined, is far from sufficient to guide one in producing the commercial product.

Omitting details, and speaking broadly, cemented tungsten carbide is made by taking tungsten, carbon and a metal of the iron group, reacting the carbon with the tungsten to form tungsten carbide, and heating the mixture to a sintering temperature below the melting point of pure tungsten carbide, at which temperature the iron group melts to bind together the tungsten carbide particles which do not melt. This idea was not new with Schroter. This was taught by Liebmann and Laise No. 1,343,-976, patented June 22, 1920. Liebmann and Laise clearly taught the idea of mixing powdered tungsten, iron or nickel, and carbon together, cold pressing the same into a body, and then sintering the body at a temperature at which tungsten carbide would form and the iron would melt to bind the tungsten carbide particles together. Liebmann and Laise simultaneously carburized the tungsten to form tungsten carbide and cemented the tungsten carbide particles together with iron. Liebmann and Laise got a claim 21 on the sintered alloy reading as follows: "The herein described product which comprises an alloy of tungsten with iron and a carbid of tungsten, said product containing approximately ninety parts of tungsten to not more than about one part of carbon." Liebmann and Laise stated that among other things their material was useful for dies for drawing wire.

Voigtlander & Lohmann German patent No. 289,066, issued December 2, 1915, appreciated the value of tungsten carbide for drawing dies and cutting tools and as a substitute for diamond wire drawing dies and cutting tools. Voigtlander & Lohmann proposed to make their cutting tool by cold pressing pulverized tungsten car-

bide without any binder and then sintering the pressed body of tungsten carbide at a temperature below the melting point of the carbide to consolidate the tungsten carbide powder into a solid body.

Voigtlander & Lohmann also obtained another German patent No. 295,726, issued December 14, 1916, which clearly taught the art to make wire drawing dies and cutting tools by mixing pulverized tungsten carbide and a few per cent of metallic molybdenum, pressing the mixture into a body and sintering the body to consolidate the same. This Voigtlander & Lohmann patent is most interesting in its references to the prior art. I quote from this patent:

"It already has been proposed, of course, in the production of formed pieces of metal carbide to add free metal to the pulverized metal carbide.

"With all these processes, however, the addition of free metals is used as a binding means, to produce a mechanically solid body from metal carbide."

Bearing in mind that Voigtlander & Lohmann were dealing with a mixture of powdered tungsten carbide and powdered molybdenum which they cold pressed and then sintered and that Voigtlander & Lohmann in distinguishing from the prior art stated that the molybdenum acted to prevent crystallization of the tungsten carbide and not as a binding means, the above quotation is a clear disclosure of Schroter's method of first carburizing tungsten to form tungsten carbide, then pulverizing the tungsten carbide and mixing the same with a binder metal, pressing the mixture into a body and then sintering the same to cement or consolidate the mixture into a solid body wherein the tungsten carbide particles are held together by a binder metal. Voigtlander & Lohmann did not specify any specific binder metal nor any proportions. However, the art is replete with references which teach the use of the iron group metal as a binder for tungsten carbide (Liebmann and Laise No. 1,343,976, Baumhauer No. 1,512,191), as a binder for tungsten (Siemens & Halske British patent No. 17,438 of 1908, Kreusler No. 1,110,303, Humphries No. 1,229,960, Fuller No. 1,-297,825).

Baumhauer No. 1,512,191, issued October 21, 1924, application filed December 27, 1922, recognized that sintered tungsten carbide without a binder metal was too brittle and too porous to be satisfactory for use

as a cutting tool and wire drawing die. In order to reduce the porosity and add strength and toughness to the tungsten carbide body so as to make it useful for tool purposes, Baumhauer cemented or bound the tungsten carbide particles together with iron or similar metal. Baumhauer's method was slightly different from that used by Schroter in that Baumhauer first pressed tungsten carbide powder into a body, sintered the tungsten carbide powder to consolidate the particles into a body, and then brought the tungsten carbide body into contact with iron or similar metal (such as by placing the sintered carbide body upon a strip of iron), then heated the tungsten carbide body and iron to the melting point of the iron whereupon the iron was drawn up into the tungsten carbide body by capillary action to completely saturate the pores and bind the carbide particles together. Baumhauer, like Schroter, first carburized tungsten to form tungsten carbide and then cemented the tungsten carbide particles together with iron. Dr. Jeffries, plaintiffs' witness, testified that Baumhauer's tools were actually made and used (1925) in the Osram Lamp Works, Berlin, Germany, and were considered to be of importance. Defendants presented a tool, Exhibit 164, made according to the Baumhauer patent. This tool was given a metal cutting test and was found to compare very favorably with defendants' regular production of cemented tungsten carbide tools in cutting ability.

There was nothing new in Schroter's process. The British patent to Siemens & Halske No. 17,438 of 1908 intimately mixed powdered tungsten with nickel (5 to 15%), pressed the same into a body and then sintered the mixture at a temperature of about 1510° C. Siemens & Halske used their sintered nickel tungsten alloy for points of pincers, and knife blades. Siemens & Halske also point out that the addition of nickel binder to the tungsten permits one to sinter the nickel and tungsten powders together at a temperature around the melting point of nickel (1452° C.) rather than at a considerably higher temperature, namely, the melting point of tungsten (3370° C.). The only difference between Schroter's composition and that of Siemens & Halske is that Schroter used tungsten carbide instead of tungsten. The carbide of any metal is always harder than the metal itself. By substituting tungsten carbide, the characteristics of which were well known prior to Schroter, for the tungsten in Siemens & Halske's composition, one obtains a product which differs only as tungsten differs from tungsten carbide, that is, in hardness.

Neither of the Schroter patents (reissue No. 17,624, and No. 1,721,416) taught anything new in composition or formula. Coles and Donaldson No. 1,702,765 had a fused alloy consisting of tungsten carbide and nickel, the nickel content falling within a range of from 10 to 25% of the total alloy. For several years Coles and Donaldson successfully used their composition for safe doors made by the Mosler Safe Company, which were capable of resisting disruption by explosives and cutting by drills or other tools. The nickel gave toughness and the tungsten carbide gave hardness to the alloy.

One of plaintiffs' witnesses testified that in 1927 or 1928 he was given a piece of cutting tool material containing tungsten, carbon and cobalt which he was told came from Germany. This metal was not produced at the trial and the process followed in making this metal was not known to the witness nor described. As far as the record is concerned, it is not known whether this metal was made by the Schroter method, by the Baumhauer method, or some other method. The record amply supports the proposition that Schroter's metal was not successful for cutting tools or dies in 1926 when General Electric Company started intensive research and development work in order to make a commercially useful product. It was not until the latter part of 1928 or the early part of 1929 that General Electric Company finally put this cemented tungsten carbide material on the market under the trade-name "Carboloy", more than six years after it obtained the right to make cutting tools and wire drawing dies by the Schroter method.

The Schroter application which matured into the original Schroter patent No. 1,549,615, was assigned to the General Electric Company in October 1923, but by virtue of an earlier executed contract, General Electric Company had the right to use this metal for cutting tools and wire drawing dies in the lamp industry as soon as the material was developed by Schroter in Germany. That Schroter's material was not successful is borne out by the testimony of plaintiffs' witness Hoyt in the following words:

"Q. After you saw that German material there at the Osram plant (1925) why was it necessary or desirable for you to carry on further research, can you explain that? A. Yes, First of all, the process which the Germans had developed for making this material seemed to be very inadequate. Secondly, after I became interested in this product I inquired at the Lamp Department of the General Electric Company and received the reply that they had actually tried it out in the lamp manufacture, but had found such a degree of variation in wearing qualities of the German material that they still adhered to their own die materials."

"Q. Why was not the German material being used in 1926 by G.E.? A. I tried to give you the ideas that I have on it. I cannot explain just why, but when I inquired of the lamp factories that was the information that was given me as to why they were not using it, that there was an irregularity in the wearing properties.

"Q. You would never be certain when you tried to replace a die whether you would get another one that would be as good or even operable? A. That is right. They said about one out of twenty gave vastly superior results to the standard die they were then using, but as to the other nineteen, they were so variable that they were not used.

"Q. Were the other nineteen as good as the other die material that they were using? A. Apparently not."

Plaintiffs' witness, Dr. Zay Jeffries, technical director of the Lamp Department of General Electric Company and Chairman of the Board of Directors of Carboloy Company, Incorporated, testified that from about 1921 until 1925 the wire drawing dies used by General Electric Company were made according to the Fuller patent No. 1,297,825. In 1925, the General Electric Company changed over to a new die composition. This die composition consisted of 80 parts of powdered tungsten, 20 parts powdered chromium, and ¼ of one part carbon which were pressed into the form of a die and then sintered. Plaintiffs used this latter die composition until 1929 when they first started to use cemented tungsten carbide as a die material in the wire drawing departments. Bearing in mind that plaintiffs had the right to practice the Schroter inventions prior to 1923

and yet in 1925 shifted over to the 80 parts tungsten, 20 parts chromium, ¼ of one part carbon, sintered composition for wire drawing dies, it is believed that this is cogent evidence of the fact that Schroter's material was not successful and commercially useful at this time. The record shows that during the years 1926, 1927 and 1928 General Electric Company had numerous research men and its large laboratory facilities working intensely on the development of tungsten carbide cemented with cobalt which it hoped would be successful. It was this tremendous research which finally resulted in a commercially successful cemented tungsten carbide.

The successful cemented tungsten carbide which finally was produced in 1929 was the product or result of the normal evolution of the cutting tool art. The record does not show that any of the patents in suit or any patents in the prior art caused a revolution or a sudden great development in the cutting tool and wire drawing die art. The record points distinctly to the fact that this excellent cutting tool material, as we know it today, evolved from the prior art in a manner more like the combining and conveying of the waters from many old springs to a field needing greater irrigation than the discovering or making of a new gusher. The record does not show that Schroter pioneered or led this development. Due to the wide limits set forth in the Schroter reissue patent, tungsten carbide with a carbon range of from 3 to 10% and a metal from the iron group consisting of not more than 10% of the alloy, considerable experimentation and research was necessary to discover the proportions necessary to give the best cutting tool and wire drawing die. Further experimentation was necessary to arrive at the proper sintering temperature and time, both of which vary with composition including the particular member of the iron group used as a binder. With the extensive research and metallurgical skill put into this problem by General Electric Company during 1926, 1927 and 1928, the present cutting tool material could have been arrived at by starting with Liebmann and Laise No. 1,343,976, or Baumhauer No. 1,512,191, or Voigtlander & Lohmann German patent No. 295,726, or even Siemens & Halske British patent No. 17,438 of 1908, just as well as from Schroter. I am satisfied that the research department of Gen-

eral Electric made use of all the teachings of the old art in producing their good metal.

It is evident from the prior art that the method used by Schroter in sintering his powdered materials was old and well known. Schroter's method did not include the numerous essential refinements in the technique of preparing and sintering the powdered materials which were worked out in the General Electric Company's laboratories during 1926 and the years following. The prior art shows that it was old to bind or cement tungsten carbide with a binder metal having a lower melting point than tungsten carbide. In some instances in the prior art the tungsten was carburized to form tungsten carbide before being cemented together with a lower melting point binder and in other instances the powdered tungsten, carbon, and iron group metal were mixed and sintered to simultaneously form tungsten carbide and bind the tungsten carbide together with the iron group metal. Schroter's percentages of tungsten carbide and binder metal of the iron group were also old.

■ In view of the above, I hold the Schroter reissue patent No. 17,624 and the Schroter patent No. 1,721,416 invalid.

■ Hoyt No. 1,843,768 used Schroter's material and simultaneously pressed and heated the powders to sinter the same. Hot pressing of various powders was old long prior to Hoyt, see Polte No. 735,293 (powdered tungsten and lead), Weintraub and Rush No. 1,071,488 (refractory carbides), Goldstein British patent No. 175,638 (tungsten carbide, iron and diamond dust). Hoyt's product is indistinguishable from that of Schroter. Obviously Hoyt did not have a new process merely because he used different metal powders than the prior art. De Lamar v. De Lamar Min. Co., Limited, 9 Cir., 117 F. 240; Farrell v. Boston & M. Consol. Copper & Silver Min. Co., C.C., 121 F. 841; Baker v. F. A. Duncombe Mfg. Co., 8 Cir., 146 F. 744; James Brown et al. v. Enoch Piper, 91 U.S. 37, 23 L.Ed. 200; Wendell R. King v. August Gallum and Albert Trostel, 109 U.S. 99, 3 S.Ct. 85, 27 L. Ed. 870; Lovell Manufacturing Company, Limited v. Alanson Cary et al., 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307. I hold this patent void in view of the prior art.

■ The only novelty in Strauss No. 1,-812,811 resides in ball milling Schroter's material for fifty hours or more. Ball milling was old, see Polte No. 735,293, Zons No. 1,520,794, Laise No. 1,531,666 (a mixture of nickel and tungsten powder, 10 to 24 hours). This patent is clearly void in view of the prior art and because it differs from Schroter only as a matter of degree.

■ Gilson No. 1,756,857 admittedly was preceded by Hoyt No. 1,843,768. Gilson's only distinction over Hoyt is that he uses the hot press process with three powders (tungsten, carbon, cobalt) instead of two powders (tungsten carbide and cobalt). Liebmann and Laise No. 1,343,976 and the British patent to Goldstein No. 175,638 taught the use of the three powders and the hot press method. The use of two powders in the hot press method suggests the use of three powders in the hot press method and does not make a new method. In view of the prior art, I hold this patent invalid.

■ Now coming to the Taylor patent No. 1,996,598 for the diamond impregnated tool: All that Taylor did was to put diamond particles in Schroter's alloy. It was old long prior to Taylor to mix diamond particles and steel and then pour molten zinc over the mixture of diamond particles and steel particles to bind the two together (Marius and Marius No. 918,069). Goldstein British patent No. 175,638 taught the idea of simultaneously sintering and pressing a mixture of tungsten powder and diamond powder, or a mixture of powdered tungsten carbide, iron and diamond dust to consolidate the same and form an artificial stone for drilling, turning and wire-drawing purposes. The German patent to Diener No. 386,776, issued December 15, 1923, taught the idea of mixing diamonds with powdered tungsten steel and then simultaneously pressing and heating the same to a sintering temperature to consolidate the powdered materials and embed the diamonds therein. Tungsten steel contains about 18% tungsten, 4% chromium, 1% vanadium, 1% carbon, and the remainder iron. In Schroter the iron group metal binds the tungsten carbide particles together. Taylor has simply added to Schroter an additional hard cutting substance, to-wit: diamond dust. In Taylor, the diamond dust and the hard tungsten carbide particles are bound together by a matrix of the iron group metal. In view of the prior art, I believe it was obvious and non-inventive to add diamond dust to Schroter's material and I therefore hold this patent invalid.

In view of the foregoing, I hold all of the claims in suit of all of these six patents in suit invalid. It is therefore unnecessary to here discuss the question of infringement.

The defendants allege and the record shows that the plaintiffs through numerous licensing agreements fix the prices at which the finished cutting tools and wire drawing dies are sold. The cutting tools include the unpatented steel shank and the wire drawing dies include the unpatented steel casing. The defendants set up as a special defense to this suit the price fixing by the plaintiffs of unpatented materials with which the patented materials are used. In view of my holding that the patents in suit are void, I do not find it necessary to decide whether this special defense is good or bad.

The Schroter reissue patent No. 17,624 was filed about four years after the original Schroter patent No. 1,549,615 issued. Defendants contend that the Schroter reissue composition claims are broader than those of the original and that broadened claims in a reissue application, which is filed more than two years after the issuance of the original patent, are void. In view of my above holding that the patents in suit are void, I do not find it necessary to pass on this defense.

There were two suits and they were consolidated for hearing. Both are dismissed with costs.

This opinion shall stand as findings of fact and conclusions of law to the extent the same have been herein stated with leave to counsel to present on or before July 19, 1940, requests for additional findings and conclusions.

### Supplemental Opinion on Defendants' "Special Defense"

Upon consideration of requests presented for further findings of fact and conclusions of law and upon further argument, I have deemed it advisable to pass on defendants' "special defense".

During the progress of the trial defendants requested and were granted leave to amend their answers by setting up as a "special defense" that the plaintiffs were not entitled to any relief because of alleged unlawful use of the patents in suit in violation of the principles established in Carbice Corporation v. American Patents Development Company, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Manufacturing Company v. Barber Company, 302 U.S. 458, 58 S.Ct. 288; and American Lecithin Company v. Warfield Co., 7 Cir., 105 F.2d 207; certiorari denied 308 U.S. 609, 60 S.Ct. 171, 84 L.Ed. ——. Testimony was taken at length on the issue thus raised and various exhibits were offered and received in evidence.

It appears that the plaintiff Carboloy Company, Inc., has issued a number of licenses under five of the six patents in suit and that each of these licenses contains a provision that the licensee shall not sell the patented material at less than the prices established and followed by the licensor in its own sales, and also a provision to the effect that there shall be no modification of the prices thus established either directly or indirectly, as, for instance, by the inclusion of other material or parts or services or labor at less than the regular prevailing prices at which the licensee is accustomed to sell such material or parts or services or labor. Carboloy Company, Inc., has established minimum list prices for the patented material itself and has also established minimum list prices for the combination of the patented material attached to simple steel supports such as tool shanks and die casings. It also appears that Carboloy Company, Inc., and its licensees distribute the patented material through agents under a form of consignment agency agreement prescribed by the licensor under which the manufacturer of the patented material consigns it to the agent in the form of blanks or tools or dies, title and the burdens of ownership remaining in the principal until the consigned material is sold by the agent at the price prescribed by the principal.

It is contended (1) that the consignment agency agreements were a subterfuge intended to conceal sales of the material and control of the price at which it should be resold; and (2) that the fixing of a price at which the patented material should be sold when attached to unpatented steel supports went beyond the limits of the patents and was unlawful.

The consignment agency agreements in question are similar in character to those which have been sustained in General Electric Company v. Brower, 9 Cir., 221 F. 597, and United States v. General Electric Company, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, as creating the bona fide relation of principal and agent, and the testimony adduced here shows that Carboloy Company has so administered them.

The testimony shows that the patented material, in order to be put to practical use, requires in most instances to be secured to some kind of a support and that any purchaser of the patented material may do this himself or may seek to have the unpatented support furnished by others and the labor of attaching the patented material to the support supplied by others at competitive prices. No premium is placed on the price of the patented material when it is sold separately. The only effect of the Carboloy Company's plan of distribution is that when a licensee or an agent fills a customer's order for the patented material attached to simple supports he must charge for the combination not less than the minimum prices fixed by the Carboloy Company, Inc. Many of the large users of the patented material maintain their own tool-making departments and purchase the patented material in the form of blanks which their tool-making departments subsequently affix to steel shanks. There are many independent tool-making concerns who are equipped to furnish and do furnish the shanks and attach the blanks of the patented material to them. Carboloy Company, Inc., is not in the business of selling steel shanks alone and has no monopoly whatsoever of the supply of steel for such purposes.

United States v. General Electric Company, supra, establishes the right of a patent owner to try to make a profit from the sale of the patented articles by requiring his licensee not to sell the licensed article at a lower price. Defendants do not question the right of Carboloy Company, Inc., to fix the price at which the patented cemented tungsten carbide shall be sold by its licensees; but the defendants do challenge the right of the Carboloy Company to fix the price at which the combination of the patented material plus the unpatented support shall be sold. On this point counsel have not directed the Court's attention to any controlling authority.

The requirement that the licensees shall not modify the established price of the patented material indirectly by the inclusion of other items at less than their regular prevailing prices is obviously a reasonable and proper one. Obviously, the right of a patent owner to require his licensee not to undersell him would be an empty thing if with each sale the licensee could include something else of value, needed by the customer, at a fraction of its real worth. The question is whether in the particular circumstances here involved the Carboloy Company may make such a provision specific and capable of effective enforcement by establishing minimum prices for tools and dies embodying the patented material affixed to steel supports. There is a general principle that any agreement having as its object the fixing of prices for unpatented material is contrary to public policy and unlawful, and this principle the defendants invoke.

Analogies are sometimes helpful. Assume that a manufacturer has a patent on ink of a certain composition and that he has granted a license under that patent to another manufacturer on condition that the licensee shall not undersell him. Would it be unlawful for the owner of the patent on the ink to fix one price for sales to customers who bring their own pails and have them filled from the manufacturer's vat, and a different and higher price for sales of the combination of the patented ink in bottles, making an appropriate allowance for the additional expense of furnishing and filling the bottles? Or must the owner of the ink patent establish only one price regardless of whether the patented ink is furnished in a container or not? The practical aspects of such a situation seem to make it in the public interest that the owner of the ink patent have the right to establish one price for the patented ink in bottles and a different price for the patented ink in the customer's own containers.

So, in the case at bar, it seems more harmonious with sound public policy that the plaintiff Carboloy Company, Inc., should have the right to fix minimum prices at which the patented cemented tungsten carbide in combination with unpatented supports reasonably necessary to secure the full benefit of the patented material shall be sold, and other and lower minimum prices when it is sold lacking the necessary support, than to say that the Carboloy Company's price control is unlawful so far as it touches in any degree the price at which the patented material shall be sold when attached to supports. It is my opinion that in mounting the patented material on simple unpatented steel supports the plaintiff has gone no farther than is reasonably and properly necessary in putting the patented material to practical use in such a way as to enable users to enjoy the full benefit of the patented material. Under the circumstances involved in this case the public interest is served since the public has been and is free to purchase the patented material at

prices which include no allowance for supports, and to invite the keenest competition for the business of supplying the supports and affixing the patented material to them. Yet the Carboloy Company's right to protect its hoped-for profit is preserved and made effective.

The Court is therefore of the opinion that the plaintiff Carboloy Company, Inc., in its license agreements, agency agreements and price schedules has done no more than was reasonably and properly necessary to enable it to protect its efforts to make a profit from the manufacture and sale of the patented material and that plaintiffs have made no attempt, of the sort condemned in the Carbice, Leitch and Lecithin cases, supra, to obtain any monopoly, limited or otherwise, of any unpatented material. The special defense of unlawful use of the patents in suit is therefore overruled.