## UNITED STATES v. GENERAL ELECTRIC CO. et al.

United States District Court
S. D. New York.

Oct. 8, 1948.

John F. X. McGohey, U. S. Atty., of New York City, Herbert A. Berman, Bartholomew Diggins and Malcolm Hoffmann, Sp. Asst. to the Atty. Gen., Robert B. Hummel, of Alexandria, Va., John S. James and Carlisle P. Myers, both of New York City, and Gareth Neville, of Washington, D. C., Sp. Attys., for the Government.

Walter Gordon Merritt, of New York City (Hyler Connell, James T. Mackey, John B. Tittmann, Thomas P. Dwyer, and Andrew M. Calamari, all of New York City, of counsel), for all defendants except Fried, Krupp Aktiengesellschaft.

KNOX, Chief Judge.

This is a criminal prosecution under an indictment returned October 21, 1941, charging defendants in four counts with violations of the Sherman Anti-Trust Law, §§ 1 and 2, 15 U.S.C.A. §§ 1, 2; and in a fifth count with violation of the Wilson Tariff Act, 28 Stat. 509. By stipulation, a jury was waived, and the case tried to the Court.

The suit concerns trade and commerce in so called hard metal compositions and products containing such compositions. By hard metal composition is meant tungsten carbide and all other combinations of tungsten, tantalum, titanium, or a similar metal, with carbon, particles of the carbide being cemented or bound together by iron, cobalt, nickel, or a similar matrix.

When hard metal is cut, or drawn out in wire or other forms, it is necessary to have a cutting tool or a wire-drawing nib that is harder even than the metal cut or drawn. In addition, the machining of other materials often requires an extremely hard cutting tool. These processes are highly useful in carrying on modern industrial life, and the search for harder cutting tools

and nibs has been a closely studied problem. Prior to the introduction of hard metal compositions, the materials generally used in the metal trade were two steel products known respectively as high-speed steel and Stellite. Hard metal compositions, to a considerable extent, have replaced the use of the last named materials. The cemented carbides have a capacity to perform tasks that other materials were unable to accomplish, and to contribute greater efficiency to many others. In addition to their use as cutting tools and drawing dies, these carbides are of importance in the fields of extrusion dies, wear resistant parts of factory equipment, and wearing surfaces of precision instruments.

The corporate defendants are Fried, Krupp Aktiengesellschaft, which is not before the Court, the General Electric Company, and two General Electric subsidiaries, the Carboloy Company Inc., and the International General Electric Company. The individual defendants are Walter Stearns, who was manager of special contracts for the General Electric Company; Zay Jeffries, technical director of the Lamp Department of that corporation and formerly chairman of the Board of Carboloy; and Walter Robbins, president of Carboloy. The four companies owned and acquired patents which were so used as substantially to dominate the entire interstate and foreign commerce of the United States in the field of hard metal compositions. This situation continued from the inception of the industry in this country in 1928, until 1940, when some of the patents were declared invalid in an infringement suit in Michigan, General Electric Company v. Willey's Carbide Tool Co., D.C., 33 F.Supp. 969.

In order to reach a conclusion as to whether defendants' activities transgressed the criminal law, it is necessary to make extensive reference to the patents involved, and also to the series of agreements by means of which the patents were exploited.

The first U.S. patent is Baumhauer, No. 1,512,191. Application therefor was made in December 1922, and the patent was issued in October, 1924. It includes both process and product claims. There is some question as to whether the product claims are limited by the process claims, an issue which would be important in the evaluation of the patent because, as the defendant Jeffries admitted, the process claims have never been used. The product claims are very broad, the inventor claiming, among other things: "4. A tool for working hard metals made from a carbide with its pores saturated with a metal," and "7. A tool made from a carbide impregnated with a metal."

Two other important patents are those which stand in the name of Karl Schroter. The so-called first Schroter, No. 1,549,615 was applied for in October, 1923, and issued August, 1925. This, also, contains product and process claims. The product claims are more specific than Baumhauer, the patentee specifying that the carbon content should run from 3 to 10% of the tungsten, and that the binder should not exceed 10% of the tungsten content. The process disclosed by this patent is known as the cold-press process, and is employed in perhaps 98% of all cemented carbide production. It consists of mixing the carbide being used, e. g. tungsten carbide, with a binder metal such as cobalt, both being in powder form, cold-pressing the mixture, and then sintering the ingredients at a temperature of about 1500 degrees, at which point the binder melts while the carbide does not. In practice, in the majority of cases where the Schroter process is used, the material is presintered, then formed, and then brought to the sintering temperature. These process claims contain the same percentages as do the product claims.

The second Schroter, No. 1,721,416, applied for in April, 1926, and issued July, 1929, claims the process and product wherein the binder metal exceeds more than 10% of the composition.

There was a variation between the first and second Schroter patents, the first claiming up to 10% of the tungsten, and the second over 10% of the carbide composition. To fill the gap thus caused, an application for a reissue of the first patent was filed in July, 1929, and issued March, 1930, and being Reissue No. 17,624.

The Schroter patents are fully discussed by Judge Tuttle in his opinion in General Electric Co. v. Willey's Carbide Tool Co.,

D.C. Mich. 1940, 33 F.Supp. 969, in which he held them to be invalid in view of the prior art.

These patents were originally owned by the Osram Company in Germany. Under a contract General Electric Company had with Osram, the American concern was granted the exclusive United States right to use the disclosures in its own manufacture of electric lamps. Consequently, the patents were issued in the name of General Electric as assignee. All the remaining rights in the patents were sold by Osram to the Krupp Company of Germany.

However, and somewhat unaccountably, it was not through the shop rights in the lamp field which were already held by General Electric, that the company became interested in the other advantages of these patent applications and patents. It remained for Dr. Hoyt, a GE engineer visiting Europe on another mission in 1925, to appreciate the further possibilities of the patents. Dr. Hoyt was introduced to Schroter at Osram and received from him certain information concerning the inventor's process and product. On returning to the United States, Dr. Hoyt brought with him a small piece of the Schroter material, "about a quarter of an inch square by ⅝ of an inch long."

Later on in that year, Hoyt began work on the material, and was shortly assisted by another engineer named Gilson. By 1928, the Schenectady works of the General Electric Company were manufacturing a substantial amount of cemented carbides for its own use for machining and wire-drawing purposes, not only at Schenectady, but elsewhere. Hoyt and Gilson both applied for patents in April, 1927, and two more GE patents were applied for in 1928. Indicative of the extent of GE research is the fact that by the end of 1929, fifteen additional patent applications had been filed, and thereafter as many patents were issued.

Of these GE patents, the more important ones are Hoyt No. 1,843,768, filed April, 1927, granted February, 1932, and Gilson, No. 1,756,857, filed April, 1927, granted April, 1930. Both of these are known as hot press patents, in contrast with those of Schroter, which are cold-pressed. Essentially, Hoyt's contribution to the art was to abbreviate the Schroter process by mixing the carbide with the binder, and then pressing and heating the compound at one and the same time. Gilson shortened the process still further by his so-called 3 powder hot-press method. Where Hoyt mixed, for example, tungsten carbide with cobalt, Gilson taught the process of mixing tungsten, carbon, and cobalt. Under his method of procedure, the carburizing and sintering take place together. Each of these patents contain product, as well as process claims.

Meanwhile, Krupp itself was manufacturing a hard metal composition that was called Widia. This material was being sold in the United States, but the volume of the business, and the selling price of the material were not clearly established upon the trial. The evidence does show, however, that on January 31, 1928, Krupp gave Morris Simons of the Union Wire Die Company a three months exclusive option on the right to import Widia into this country for use in dies, and on July 7, 1928, Simons and Krupp signed a three years contract along these lines. Furthermore, Widia appears to have been sold here in 1928 for use in tool cutting by the firm of Thomas Prosser & Sons. By letter dated August 13, 1928, Krupp quoted Prosser prices which were in the neighborhood of 10¢ per gram. There are 453.59 grams in a pound.

By September, 1926, GE had begun to think seriously of the desirability of acquiring rights in these patents, in addition to such as had already been acquired through its Osram contract. The original thought was that GE would bargain for shop rights, and that Krupp would have all others, including rights to the GE improvements, and the right to license others to use the patents in the lamp industry. Apparently, Krupp offered a license to manufacture and sell, but on unsatisfactory terms, and by October, 1927, GE was considering the advisability of obtaining exclusive United States rights. A memorandum expressing the "tentative agreement" of the parties was signed on April 17, 1928, and the contract itself was finally signed on November 5, 1928.

Considerable evidence was submitted by both sides on the issue as to whether GE sought rights under the German patents because of its belief that they were basic, and dominated the GE applications and patents, or whether GE acted in bad faith, with the object of employing independent competing patents, or invalid patents, to establish a monopoly. As will appear more fully below, in the view which I take of the case, it is unnecessary to make a finding on this point.

The 1928 contract was for 15 years, with automatic extension thereafter until terminated by 6 months' notice. Basically, Krupp assigned to GE all its present and future United States patent rights in the field of hard metal compositions. Three such patents and six applications were listed, including Baumhauer and the Schroter. Krupp had an outstanding contract with Gewerkschaft Wallram of Essen, which permitted the latter to export Krupp-manufactured dies into the United States, and the new contract recognized this right. Krupp itself was permitted to import into the United States under any of the GE-held patents, or under any improvement to which GE should acquire future patent rights. An arrangement was made for the exchange of technical information between the parties. GE agreed to issue a "reasonable number" of non-exclusive licenses to make, use, and sell under the patent rights and agreed specifically to license Ludlum Steel Co. and Firth-Sterling Co., two companies to which Krupp had promised rights under the patents. With these exceptions, GE's control of the patents within the United States was to be complete. GE, apparently at Krupp's insistence, agreed to fix prices and terms of sale, and to require all licensees not to sell at a price or on terms more favorable than GE's own sales. Krupp agreed that its material sold here would conform to the GE prices. Krupp was to receive two-thirds of a royalty fund to be created, less litigation expenses which were to be paid out of the fund. Licensees were to be charged a royalty of $5 per pound and this $5 was to go into the fund. GE was to contribute $5 for each pound it sold itself, and Krupp was to pay $5 for each

pound it exported into the U. S. The remaining third of the fund was to go to GE. The contract was predated to April 17, 1928, apparently in an effort to make the Krupp-Simons contract subservient to the GE contract.

Thus was created the combination which was foretold in April of that year, when Knight Brothers, who were Krupp's American attorneys, wrote Krupp a report of conversations had between themselves and Morrison, for GE: "Each company has something to bargain with and it looks as though there is a real inducement for combining forces since neither company can dominate the situation alone and there is a fair chance that by pooling the patents competition could be discouraged."

In September, 1928, GE incorporated the Carboloy Company as a subsidiary in which it had a majority interest, and thereafter assigned to it the GE rights under the Krupp contract, as well as its other interests in the hard metal composition field. This company carried on all GE's activities in the field of corboloy, as the new material was called. In 1932, GE obtained complete ownership of Carboloy.

At this point, it may be appropriate to describe the commercial scheme which was employed to exploit the patents in question. At the head were the Carboloy Company and the manufacturing licensees, of which there was a total of five. These companies manufactured hard metal compositions. The output was sold in two forms: in blanks, nibs or other parts, and as completed tools, dies, etc. A carboloy tool consists of a steel shank with a carboloy tip. The shank is designed to be attached to a lathe or other machine and the carbide tip is brazed into a slot at the end of the shank. Because of the high price of cemented carbides, an entire cemented carbide tool would be of prohibitive cost. Similarly, a die contains a hard metal composition nib and a rim made of some other material. The manufacturers sold finished products and parts directly to users, who themselves made up the product if they bought the part, and to agents. These agents either resold the parts or products, or made finished products out of the parts and these they sold.

The Carboloy Company published a very complicated manual which fixed the prices at which manufacturers and agents could sell parts and finished products. The price was fixed on all items except so-called "particular tools". These were more or less unusual tools for which the manual did not attempt to fix a formula for the price of the completed instrument. Only the cemented carbide content was price-fixed in such tools.

On an average, it may be said that the cost of the hard metal composition was about one-third to one-half the cost of the finished tool.

Thus, in addition to the Carboloy Company, there were four groups in the field: (1) the manufacturing licensees, (2) the agents, (3) the Krupp Company and its United States outlets, Morris Simons of Union Wire Die, and Thomas Prosser & Sons, and (4), a group not yet mentioned, the so-called infringers. It will be convenient to describe the events of the 1927–1940 period, to which the indictment relates, in terms of the GE-Carboloy relations with these various interests.

### The Krupp Company and Its United States Outlets

Relations between Krupp and GE were uncongenial from the very start. Krupp complained about GE's price-fixing policy, and GE complained about the price-cutting being practiced by the Krupp outlets in the United States.

GE fixed the first price of cemented carbides at $453 per pound, or $1 per gram. Robbins testified that costs of production at that time were between six and twelve cents per gram. Krupp saw in this a direct attack upon its imports, and, in fact, Krupp imports declined substantially. Krupp apparently assumed that GE wished to destroy the entire cemented carbide business in the opening period when Krupp was equipped to manufacture Widia, and when its American outlets were well known in the trade, while Carboloy, at that time, was not well equipped and not well known. Then when Krupp had practically been forced out of the market, and Carboloy was ready to begin operations, Krupp suspected there would be a serious price re-

duction. Krupp wrote GE in March, 1929, and said: "On this occasion we would like to discuss the price question in general. The article by Alva Johnston in the New York Herald Tribune of January 7, 1929 must be no doubt known to you. * * * We do not need to call your attention to the fact that the misrepresentation therein, which gives the impression that the American prices were stipulated by us, as well as the sharp criticism of the tremendous prices for which you alone are responsible, has done incalculable harm to our name and reputation. We find that the fixing of the sales price according to the schedule * * * is not in accord with the spirit of our contract and of our (sic) verbal agreement with our Messrs. Preussing, Strauss and Artz and your Mr. Stearns. * * * These prices constitute practically a hindrance to our import and are, for this reason, against our contract. Kindly wire us proposals concerning much lower prices."

Along with this went a complaint as to the method of fixing prices. As suggested by the reference to a "verbal agreement" in the letter just quoted, it was the Krupp understanding that the 1928 contract did not provide for Krupp-GE agreement on prices to be fixed only because such a provision would be illegal. However, Krupp thought that an oral agreement to that effect had been reached, and that GE would fix no price before reaching agreement with Krupp. An unsigned, undated memorandum of the negotiations leading up to the 1928 contract, written in German, and which, following the recent war, was found in the Krupp files, contains the following: "Mr. Stearns explained * * * that G.E.C. would be absolutely willing to agree on the prices but that this must never be expressed in the contract itself or in any correspondence which might come into the files of G.E.C.; that in case of price changes, G.E. C. was in the habit of inviting the interested parties to oral conferences in the course of which the prices would then be actually agreed upon; that if the resulting price changes would come to the attention of the authorities and the latter would initiate investigations at G.E.C. under the

Sherman Act, (G.E.C.) would admit that there had been conferences with the interested parties but that they had only been of an informatory character and that G.E.C. had fixed the prices on the basis of the information thus obtained."

In January, 1930, Krupp and GE representatives met in Germany to discuss their difficulties. The Germans presented their understanding of the true import of the 1928 contract, but Mr. Stearns strongly denied any such interpretation. On the witness chair, Mr. Stearns reiterated his stand that the contract meant exactly what it said, namely that GE was to fix the prices.

However, at that 1930 meeting, Mr. Stearns seems to have felt that Krupp should have some assurances that GE would not fix prices without first consulting the German company. Accordingly, GE submitted to Krupp for signature a letter stating that, "G.E. intends to exploit hard metal composition in the United States in the best manner possible, and fully intends that the prices, terms and conditions established by G.E. (as to which G.E. retains full freedom of action) either directly or through Carboloy in accordance with the terms of the Main Agreement will be fair and reasonable to all parties concerned." Krupp rejected this as "merely a promise on your part to maintain a price policy in accordance with the spirit of the agreement. This promise in no wise provides for an extension of our former rights, and, besides, its value is problematical."

When Stearns was examined at the time of the trial, he said that he had promised Krupp that prices would be "fair and reasonable," but explained that this meant that they would be fixed only after due investigation.

The Krupp outlets in the U.S. were Morris Simons' Union Wire Die Company, and Thomas Prosser & Sons. Simons sold the die line, Prosser the tool line. Krupp's various contracts with Prosser were all subsequent to November 5, 1928, and so were subject to the basic Krupp-GE agreement of that date. Consequently, while Carboloy had some difficulty with Prosser's price-cutting, it was not important.

Simons, on the other hand, was a source of great difficulty to the family of licensees until 1937, when Carboloy finally took over the Simons business. The extent of GE's concern can be measured by the fact that at the time of the purchase Simons was estimated to be doing three to four times more business in the die line than Carboloy.

Simons had signed its original contract with Krupp in July, 1928. This was a three year agreement with a three year automatic renewal clause contingent on a certain volume of business which, apparently, was surpassed. As previously stated, the 1928 GE contract was predated from November 5 to April 17, in order to subject Simons to the new arrangement, but, unfortunately for the defendants, Simons did not feel himself obligated thereby.

The Carboloy efforts took two directions, viz., pleas to Krupp to bring Simons into line, and direct discussions with Simons. It was the opinion of the GE lawyers that the 1928 contract required Krupp to impose price control upon Simons. Dr. Jeffries testified that from time to time he asked Krupp to see to it that Simons observed the prices, but that he did not ask Krupp to compel Simons to follow the price line. The record shows, nevertheless, that Carboloy did ask Krupp to compel Simons to maintain the price structure. For example, Batchellor, a representative of Ludlum Steel, who was about to visit Essen, was asked to "impress upon the Krupp Company the necessity for taking prompt action in regard to this matter." Batchellor followed instructions, and reported that he "was assured by them that they would at once take all necessary steps to impose upon Mr. Simons the absolute necessity of living up to the selling prices fixed by you on dies made of Hard Metal Composition."

As to the direct discussions between the parties, the Government maintains that the record proves that "by 1933 Carboloy and Simons had reached agreement with each other as to prices." In my judgment, the record shows a much more complicated situation, namely, periodic adjustments between parties whose interests clashed in some respects, but were identical in others. Simons, of course, wished to remain free

of the price manual, while the GE licensees wished him to abide by it. In this there was opposition. But both Simons and the licensees were interested in avoiding a disastrous trade war. Both wanted to maintain the high prices of the manual, and did not wish their differences to result in a complete breakdown of the price structure. Thus, the record shows that there was a series of verbal agreements in which Simons promised to abide by the manual; agreements which both parties knew would not be maintained to the letter, but which did allow them to live together in the field.

On March 18, 1929, Krupp responded to a GE complaint about Simons by noting that, "according to Mr. Simons your Mr. Stearns had further declared that the prices which were submitted to him by Mr. Simons would be valid for the coming six months." Thereafter, in early 1929, Carboloy made several direct efforts to reach price agreements, but failed. Stearns met with Simons and Krupp representatives in Essen in 1930, and renewed his attempts to achieve a price agreement, but with slight success.

However, there was some measure of agreement later on. On March 21, 1933, Robbins, who was then vice-president of Carboloy, wrote Simons complaining about a new "guarantee" that Union had published to the trade. "In line with your understanding that you would be advised of any changes we might make in the die manual, don't you feel that we have reason to feel the same toward your changes? This guarantee, although within the terms of the manual, is in our opinion, another reduction in die prices. I will be pleased to have your reaction to this matter."

On June 16, 1933, Robbins had a conference with Simons. "The purpose of this discussion was to determine whether or not the Union Die Company was selling dies to National Tube Company at a discount of 20% from the Carboloy Company Die Manual prices." From Simons' denials, as reported in the memorandum of the conference, it is clear that Simons was somehow bound to follow the manual. The report also contains this statement: "Considerable discussion ensued concerning the verbal agreement made by the Carboloy

Company and the Union Wire Die Corporation before May 15, 1932. Mr. Simons' understanding of this agreement agreed with mine in that all contracts relative to the leasing of dies and any other contracts with die users entered into prior to May 15, 1932 could be performed in accordance with their terms but could not be extended." This last phrase referred to leasing contracts which allowed Simons to procure a great share of the die business. These contracts, under the manual, were forbidden to Carboloy and the other licensees. Robbins told Simons that "the Carboloy Company and its Licensees were completely through with dealing with him on any basis which would in any way give him a price advantage" and, "that regardless of reciprocal relations or anything else our prices were going to meet his prices one way or another." The threatened price war did not materialize. On July 27, 1937, Robbins wrote one of his salesmen as follows:

"It is true that the Union Wire Die Corporation has a stock of Widia material which was puchased by them some years ago. This stock is their own property and can be sold to the trade. While Union is under no legal obligation to sell this material at our prices, terms, and conditions of sale, they have nevertheless indicated that their prices will be in accordance with the price manual as issued by Carboloy.

"I will be pleased to have you report any instances where you find Union supplying Widia material at prices other than ours."

Simons was invited to and attended the licensee meetings. Carboloy even attempted to fine Simons for price deviations but Simons didn't take kindly to the idea.

One further source of bad feeling between the parties should be mentioned. Krupp maintained that the 1928 contract prohibited exports by GE and Carboloy. GE contended the contrary. The upshot was that GE agreed not to export except to South America, where the trade was very small. This accommodation also involved a refusal to fill a substantial order from Russia, which Carboloy first planned to solicit, but finally decided not to sell.

Due to these difficulties, Krupp and GE entered into new negotiations, and in April,

1936, a contract was signed amending the basic 1928 document. GE territory was broadened to include Canada, but neither GE nor its licensees could export out of this licensed area. Krupp, on the other hand, agreed not to export into the GE area, in return for which concession the royalty rate returnable to Krupp was increased. Krupp's consent would be necessary for any sublicense to be issued by Carboloy in the future. The contract was to be effective July 7, 1937, unless Krupp should cease importing, or Carboloy should enter into agreement with Simons, at an earlier date, which date would then be the effective date of the amended contract.

According to Jeffries' testimony, the Krupp Company was willing to eliminate Prosser and Simons without any compensation, but the GE Company insisted that these concerns be fairly treated. On May 1, 1936, Prosser sold all its assets and good will to Carboloy upon the following terms, to wit: a down payment of $13,000 for the purchase of the inventory, and the balance, amounting to almost $300,000, payable over seven years, the annual payment being contingent on Prosser's not competing with Carboloy. Simons, as usual, was much more difficult to deal with, and it was only after extended negotiations, and GE's request of Krupp "to strongly bring as much pressure as possible on Mr. Simons," that Simons capitulated, and sold his business, along with a covenant not to compete, for a sum close to a million dollars. The indenture was signed July 14, 1937.

After careful consideration of the exhibits and the testimony, I am forced to conclude that the elimination of Prosser and Simons from the hard metal field was not due to a sense of fair play on the part of GE, but was designed to overcome their competition and to obtain an effective price control of hard metal composition in the American market. The most convincing evidence of this purpose is afforded by a study of the extended difficulties preceding the Simons contract. If Krupp could cut Simons loose without further ado, and if the GE-Krupp contract were not dependent upon the elimination of Simons, GE would have been able to come to an agreement much more rapidly, and would not have been obliged to make an expenditure of one million dollars. Other portions of the record confirm this view of both purchases. In January, 1936, Krupp wrote to Prosser, and said: "The arrangement which we proposed to these gentlemen (GE representatives), was that we would in the future abstain from shipment of Hardmetal to the United States. In making the above proposition, we of course expect, that an understanding between the General Electric and you will be reached which will respect your interests." A similar letter was sent to Simons. Also to be considered are the following excerpts from Jeffries' testimony:

"Q. Wasn't that amount paid for the sole purpose of eliminating Thomas Prosser & Sons, Richard Prosser and Roger Prosser from competition with Carboloy in respect to hard metal compositions? A. Well, I don't know what the purpose would be. We settled this affair with Mr. Prosser in a manner satisfactory to him and in a manner satisfactory to us. The assets and good will and so forth that he could turn over to us were not very valuable to us. * * *

"Q. Isn't it a fact, Dr. Jeffries, that the remaining amount, that is the amount of $300,000, minus $13,500, covered no other consideration than Prosser's undertaking to refrain from competition? A. Well, we got no other value out of the payments so far as I know, than that."

The basic purpose of the arrangement is further revealed by a statement made by Robbins in February, 1936. In his judgment, the most important advantage of the arrangement was this: "an effective price control on all merchandise would immediately be possible. * * * I feel that in the next seven or eight years an effective price control on our part with the matter of new price arrangements entirely in our hands we can by careful selection and decision increase the profits to be taken from this business in a very substantial amount over our present operations."

At this point, it is fitting to discuss the activities of the International Electric Company (IGE).

IGE was a wholly owned subsidiary of GE, charged with complete responsibility for GE's foreign business, except that Canada remained within the jurisdiction of GE. In this capacity, IGE administered the restrictions on exports which had been agreed to between GE, Carboloy, and Krupp. Further, IGE was responsible ·for negotiations with other foreign companies concerning cemented carbides. Thus IGE had a contract with Allgemeine Elektriciaets-Gesellschaft (AEG), a German corporation, which, essentially, was a pooling and territorial division of patent rights. This contract applied to cemented carbides from 1927 until October 7, 1938. The manner in which this contract operated is illustrated by a letter written by Scudder of IGE to Jeffries in January, 1935. AEG was negotiating with Siemens, another German corporation, concerning a proposed Siemens license of its hard metal composition patent rights to Krupp, in return for an increase of royalty which Krupp would pay Siemens, and Siemens would then divide the same with AEG pursuant to a contract between them. In order to carry out this proposal, it was necessary for AEG to have IGE's approval. IGE withheld its assent. Its attitude was this: "We do not want Krupp to be able to sell in this country an alloy which is better than what the Carboloy Co. or we may make. Our position, therefore, at the present writing is that we do not want the AEG to enter into any arrangement with Krupp so that Krupp will have the right to manufacture in Germany under German patents and inventions originating with the General Electric Company or Carboloy Company and also Siemens, unless we can get the rights under any Siemens United States present or future patents to manufacture, use and sell in this country."

## The Manufacturing Licensees

Each of these had certain provisions in common. Each license recited that it was subject to the basic Krupp-GE contract. The licensee was granted a non-exclusive right to make, use, and sell hard metal compositions in the United States, its territories and possessions. The licensee agreed not to sell at a price or on terms of sale more favorable than Carboloy's own price and terms, so long as such articles or their processes of manufacture continued to be covered by any of the licensed patents. The licensee further agreed not to violate the spirit of this provision. The licensee's books were to be open to inspection by the licensor. The licensee also stipulated that if it should fail to abide by the contract terms it would, in the absence of any evidence to the contrary, pay damages equal to the total value of the articles involved at the price specified in the manual. The licenses were personal and of restricted assignability. The licensee admitted the validity of the patents licensed or to be licensed, except as invalidity should be determined in a suit between other parties.

It seems hardly necessary to set forth the history of each of these licenses in the fullness of detail presented by the record. In general, it may be said that Carboloy issued a license only when it felt it to be expedient, and then did so under such restrictive provisions as could be negotiated.

The first and more liberal licenses were those issued to the Firth-Sterling and Ludlum Steel Companies, in January, 1929, as was required by the basic 1928 contract. The licensed field was defined as including three listed patents and ten listed applications, plus any improvements thereon, to which the licensor might acquire patent rights in the future. The licensees agreed to grant non-exclusive rights to Carboloy and Krupp on any patents in the field that they might thereafter acquire.

The other licenses were issued to competitors operating under patents which Carboloy always claimed were dominated by its own patent rights. American Cuttings Alloys was licensed in April, 1933, Fansteel was licensed in August, 1933, and Eisler Electric was licensed in October, 1934. The history of the first of these is typical of the three.

In 1932, Dr. Schwarzkopf, a German inventor, came to America to exploit a cemented carbide called Cutanit, for which a patent application had been filed in this country in 1930. The Cutanit material was perhaps the first titanium carbide that was offered to the trade, and its efficiency, at

least for "light cuts" on steel, was decidedly greater than that of any material then made by Carboloy, or its licensees.

The licensees were much upset over the competition thus threatened, and were anxious that Carboloy obtain rights which would enable them to make use of this material. Carboloy itself was extremely worried. Indeed, on August 24, 1932, Jeffries wrote Davis, vice-president of GE, comparing Carboloy and Cutanit with tantalum lamps and the tungsten lamps which completely replaced them: "It may be that Cutanit is the new tungsten of the cutting alloy field, whereas our present product is merely the tantalum and may eventually pass out of existence as did tantalum lamps. We do not believe the importance of Cutanit is as great as this. * * *" On October 7, 1932, Jeffries wrote Ludlum Steel that Carboloy's first objective was to obtain complete patent rights on Cutanit, and its second objective, if the first could not be obtained, was to put Cutanit under price control. By November, Jeffries was thinking of offering Schwarzkopf a limited license. "This, apparently, would clear up the whole patent situation and put everything under price control and, I believe, leave us and our licensees in a preferred position in the field."

In August of 1932, by threat of an infringement suit, Carboloy obtained from Schwarzkopf a promise not to sell his material for three months, during which period Carboloy was to make tests as to its capabilities. In October of that year, the licensees had a meeting at which it was decided that, if it were necessary to pay a considerable sum in order that all might have rights to Cutanit, the licensees would absorb a portion of the cost in the form of additional royalties for the use of Cutanit. Finally, in April of 1933, the license was signed.

The Cuttings Corporation, Schwarzkopf's concern, was licensed to make, use, and sell hard metal composition under 18 listed patents and 14 listed applications belonging to Carboloy, and under any improvements thereto to which Carboloy might subsequently acquire patent rights. However, hard metal composition was given a restrictive definition, being confined to material containing 16% or more of titanium, or other members of the same chemical family, but not including tantalum or tungsten. The royalty rate was 16.15 cents per cubic centimeter of hard metal composition. The Cuttings Corporation granted Carboloy an exclusive U. S. license under six listed applications, and any patents to issue thereunder, Cuttings retaining the right to practice these inventions. Carboloy could sublicense any of its own licensees to the Cuttings patents. Cuttings was to receive 16.15 cents per cubic centimeter for material produced under its patents. Cuttings expressly agreed not to export.

The Fansteel and Eisler licenses were both granted after Carboloy had filed infringement suits against these concerns. At this time, an infringement suit brought by Fansteel against Carboloy was also pending. The suit against Eisler was not brought in Eisler's home state, New Jersey, but against a subsidiary's agent in Detroit. It was thought that the New Jersey Federal Court was hostile to patents, and that if the action were brought in that jurisdiction, "we would run the risk of throwing the whole patent situation wide open."

The Fansteel license was limited to material containing 17% or more of tantalum. Carboloy and the other licensees were granted licenses to manufacture this same material under three patents and 16 applications owned by Fansteel. Further, upon request, Carboloy could have a non-exclusive license to any other Fansteel patent rights in the hard metal composition field. While the license was denominated non-exclusive, Fansteel could not issue other such licenses without Carboloy's consent. The Eisler license was limited to material containing not more than 16% titanium, or more than 17% tantalum, and Eisler was given a quota of 5% of the total U. S. production or 750 pounds per year, whichever was greater. In return, and in addition to royalties, Carboloy was to have a non-exclusive license, royalty free, under Eisler's existing patent rights (four patents and two applications), and any future patent rights it might acquire in the field.

Here, again, Carboloy's consent was, necessary before licenses could be granted by Eisler to others. Export was prohibited.

By the time the Eisler license was signed, the Ludlum license had been cancelled. GE had developed a new metal, called #548, and in April, 1934, this was licensed to Ludlum on condition that the latter retire from the carbide business. A similar offer was made to Firth, but while that company was eager to obtain a 548 license, it would not accept the condition that it surrender its carbide license.

The Cuttings Company apparently refused to remain within the terms of its restrictive license. In early 1938, Robbins wrote Krupp that Carboloy would sue if the Cutanit people continued to violate their agreement, a decision in which Krupp heartily concurred. Carboloy also took notice of the fact that Cuttings was apparently suffering some financial troubles. Nevertheless, no suit was instituted. Instead, a new and broader license was negotiated. Cuttings was permitted to manufacture not in excess of 750 pounds of material per year, "not containing more than 2% by weight of any one, or any combination of titanium, vanadium, zirconium, boron and silicon" and was licensed without any quantity restriction on material containing more than 2% of such ingredients.

Two devices were employed to keep the licensees working together. Formal meetings of the licensees, to which Prosser and Simons were invited, were held from time to time. In the early thirties, especially, these meetings were held monthly or bimonthly. The evidence does not clearly establish what business was transacted on these occasions. No records were kept of the proceedings. It was admitted, however, that prices, and price changes, were discussed. The defendants maintain, nevertheless, that in no instance did they ever reach an agreement with the licensees on what the price should be, although they do not deny that one of their prime purposes in these meetings was to hear the licensees' opinions on prices. On cross-examination Robbins testified as follows:

"Q. Suppose at one of these meetings four of the licensees would have the same opinion as to what the prices would be and one stood aloof and thought that price was either too low or too high, what would be your action then? A. You mean if four of them were thinking a certain price was the right price, and one of them did not think so?

"Q. Yes. A. Generally speaking, the situation would be like this: If we had submitted a proposal and these fellows had said, 'We all agree to this and we think that is O.K. for our business,' there was no agreeing. We did not even use the word. We would have published that price. "Q. Did you take the consolidated judgment of the four? A. Not necessarily. You see, the way it was done: we would submit these proposals to the licensees and discuss them generally; the field conditions, the development of the business, and so forth, and we would publish that price, or a different price, but we never sat down and said to them, 'We will send you this price on Monday,' or any agreement like that. We felt all the way through we had the right and we had the authority to set those prices.

"Q. As I understand what you are saying, you reserved the right to exercise your independent judgment as to prices irrespective of what was said at those meetings? A. That is correct."

On another occasion, and by way of reply to an inquiry from Prosser as to the agenda of a forthcoming meeting, Robbins wrote that "for obvious legal reasons it is impossible for me to outline the various items we intend to discuss at the meeting." On the stand Robbins could offer no adequate explanation for this language.

The other device was the Cemented Carbide Supervision Bureau. Its history was described in a letter Robbins wrote to Prosser in February, 1932: "It was determined at the Licensees' Meeting held in New York in December, 1930 that this Violations Bureau should be established, and that upon definite proof of price infraction the violator should pay to the Cemented Carbide Supervision Bureau an amount not to exceed the total amount of the order involved in each instance. It was further agreed that each Licensee would be held liable for

the action of his Agents, and that the amounts collected from such fines would go to defray the expenses. * * *" The purpose of the Bureau was to police the prices at which carbides were sold, and to insure that they conformed to the manual. Carboloy itself was not infrequently caught in a violation, and it, too, had a fine assessed against it. During the first year and a half, expenses above fines collected were prorated by agreement among the licensees. Carboloy began to operate the Bureau in July, 1932. It thereafter continued, however, as a "nonpartisan" instrument for the protection of the price line in the interests of all the manufacturers.

### The Agents

Mention has already been made with respect to the agency plan of distribution adopted by the Carboloy Company. This phase of the business will be more fully described in discussing the charge of resale price maintenance. It may be noted here that Carboloy itself had 130 agents, and that the total number of agency appointments for all the manufacturers was between 350 and 400.

### The Infringers

As already noted, manufacturing licenses were granted to three alleged infringers—American Cuttings Alloys, Fansteel, and Eisler Electric. American Cuttings Alloys was threatened with an infringement suit, and was induced to give a three months option to Carboloy. The other two were actually sued, although the actions were never brought to trial. The defendants claim that the American Cuttings Alloy and Fansteel licenses were issued to avoid patent litigation, and that the Eisler license was issued because Laise, of the management of that company, could not effectively be restrained by means of any court order, but would create a new corporation and resume competition.

In addition to Simons and Prosser, and these three alleged infringers, the licensed family, from time to time, was harassed by competition from smaller manufacturers. In all, the record shows fourteen such competitors. The striking feature of the record is that, although the first suit was filed in 1930, the patents were not judicially considered until 1940. This came about in the case of General Electric Co. v. Willey's Carbide Tool Co., supra. The patents on which plaintiff then relied were the Schroter patents, Hoyt, and Gilson. Judge Tuttle held each of them to be invalid.

The delay in reaching an adjudication of the patents was due to a number of reasons: In some instances, GE deliberately refrained from instituting suit. On one occasion, a suit was dropped for the reason that the defendant discontinued business. On another occasion, the litigation came to an end when the defendant took an agency license. As to some of the others, the evidence for defendants was that one was dropped because another was pending. The Cleveland Automatic Machine Co. suit was terminated by a consent decree, holding the patents valid and infringed, but with no accounting or costs, because the Marvel Rare Metals Co. suit was pending. That suit was not pursued because the Super Tool Co. suit was pending. One of the reasons that suit was not urged was the pendency of the case against Tool Metals Co. This case was not diligently prosecuted because counsel were pressing for trial in the Super Tool case. This last was the suit which terminated in the Eisler Electric Co. license, Super Tool being a subsidiary of that concern.

A third group of infringers should be mentioned. These were Ford and General Motors, two large users who made or threatened to make their own material in order to get lower prices. Although Jeffries stated that suit against Ford was contemplated at one time, the record indicates that the real purpose of the licensees was to sell material to Ford, and not to sue him. The same is true as to General Motors.

With this resume of some of the factual circumstances of the case, attention should here be given to Section 1 of the Sherman Act.

It will be appropriate first to discuss the application of Section 1 of the Sherman law, and then to consider the three counts of the indictment that are laid under Section 2. Count 4 of the indictment charges a conspiracy in violation of Section

1. It is horn-book law that decision in a case such as this may turn on an evaluation of "the whole picture, not individual figures in it." United States v. Pullman Co., D.C.Pa.1943, 50 F.Supp. 123, 135; United States v. Reading Co., 1912, 226 U.S. 324, 357, 33 S.Ct. 90, 57 L.Ed. 243; American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, 106. This rule of evaluation as a whole may apply to patent anti-trust cases as well. Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 41, 48, 33 S.Ct. 9, 57 L.Ed. 107; National Harrow v. Hench, 3 Cir., 1897, 83 F. 36, 38, 39 L.R.A. 299; Standard Oil Co. (Indiana) v. United States, 1931, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 401, 68 S.Ct. 525. A patentee may not use his patent to transcend what is necessary to protect the use of his grant. Patent rights when "pushed to evil consequences" are well within the restrictive provisions of the Sherman Act.

■ In making appraisal of a particular set of facts, a Court need not find that specific practices violate the law. It may take into account, as suggested above, the ultimate result of the sum total of the circumstances revealed by the evidence. Following this process, it is my conclusion that the General Electric Company and its co-conspirators are revealed by the proof before me to have been guilty of a large number of specific illegal practices, and that these illegal practices, as disclosed by the record as a whole, condemn the scheme that the parties had in mind. First of all, I shall discuss the indicia of illegality, and I shall then set forth the reasons which lead me to reject the various defenses on which I am asked to acquit the defendants.

1. *A cross licensing of patents providing that one licensee would grant sublicenses and fix selling prices which all would follow.*

■ In United States v. Line Material Company, 1948, 333 U.S. 287, 68 S.Ct. 550, it was held that such a cross-license violated Section 1 of the Sherman Act although one of such patents dominated the other, so that the latter could not be practiced without a license from the holder of the dominant one. The Krupp-GE license and three of the manufacturing licenses cross-licensed patents. At best, these were improvement patents, and not competing basic patents. The Firth-Sterling and Ludlum contracts did not cross-license then existing patents, but did cross-license future patent rights to be acquired by the licensees. I have no doubt that these agreements also come within the rule of the Line Material case. Cf. also United States v. Masonite Corp., 1942, 316 U.S. 265, 276, 62 S. Ct. 1070, 86 L.Ed. 1461.

■ Defendants contend that to apply the Line Material case, or United States v. United States Gypsum Company, 1948, 333 U.S. 364, 68 S.Ct. 525, rehearing denied 1948, 333 U.S. 869, 68 S.Ct. 788 both of which were decided on March 8, 1948, would be to violate the prohibition against ex post facto laws contained in Article 1, Section 9 of the Constitution. In the first place, such prohibition applies only to statutes, and not to judicial decisions. Ross v. Oregon, 1913, 227 U.S. 150, 33 S.Ct. 220, 57 L.Ed. 458; Frank v. Mangum, 1915, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969. Secondly, these opinions did not overrule any prior decisions of the Court, and there is thus absent the element of reliance which has seemed to some courts to justify extending only prospective application to an overruling decision. State v. Longino, 1915, 109 Miss. 125, 67 So. 902, Ann.Cas. 1916E, 371.

2. *Manufacturing licenses providing for price control over unpatented products.*

As I have noted, the manufacturing licensees sold both hard metal composition material and hard metal composition products, that is, the raw material or parts, and the finished product. With a few exceptions, these products were unpatented. The Carboloy Company felt that if it did not fix the price of the finished product, it would be unable to maintain price control over the carbide component. Manufacturing licensees and manufacturing agents it was believed would take a loss on their labor or material costs in order to depress the final price. Consequently, Carboloy made a careful study of what actual material and labor costs should be for the production of price-fixed products, and required that the final selling price reflect these estimated average costs. By this

device it was possible to fix a uniform price for all sellers, though costs actually varied between them. So long as the complicated formulae of the price manual were correctly computed, the minimum prices would be identical to the penny. As already noted, this did not apply to so-called "particular tools", although even for such tools the agency contract said that the labor supplied was for the account of the principal.

The Government contends that the true purpose of this arrangement was to prevent price competition in the tool line among the licensed family. A finding on the real purpose of the defendants is not required here since, whatever the purpose, such an arrangement is illegal. Individual practices within the scope of the patent grant are condemned only if "pushed to evil consequences." But there can be no justification for fixing the price of an unpatented product. A patentee may not employ his patent to restrain trade beyond the scope of his grant. Mercoid Corp. v. Mid-Continent Investment Co. 1944, 320 U.S. 661, 64 S.Ct. 268, 271, 88 L.Ed. 376. As was stated in that case, "The necessities or convenience of the patentee do not justify any use of the monopoly of the patent to create another monopoly." Permissible price control can not be protected by price control on an unpatented item. Cf. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. United States Gypsum Co., supra.

The license agreements now before the court provide that the licensee would follow Carboloy's prices "so long as such articles or their processes of manufacture continue to be covered by any patents within this license." While this circuit had been in conflict with others on whether product price-fixing on the basis of process patents was justified, Straight Side Basket Corp. v. Webster Basket Co., 2 Cir., 1936, 82 F. 2d 245; Barber-Colman Co. v. National Tool Co., 6 Cir., 1943, 136 F.2d 339, Cummer-Graham Co. v. Straight Side Basket Corp., 5 Cir., 1944, 142 F.2d 646, certiorari denied 1944, 323 U.S. 726, 65 S.Ct. 60, 89 L.Ed. 583, Judge Learned Hand suggested in United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 438 that this circuit considered the problem to be "in flux."

3. *Licensing on condition that the licensee or agent should assign or cross-license future patent rights.*

The Carboloy Company ensured for itself access to any patent rights which any of its manufacturing licensees or agents might subsequently acquire. In the case of the manufacturing licensees, Carboloy was either automatically licensed, or was required to be licensed on request, to any such patent rights. In the majority of cases, these licenses, in effect, were exclusive. The agency contracts required the agents "upon request of the Company at any time," to "assign to the Company, without further charge, all such inventions and applications for United States patents which relate to cemented hard metal carbide or similar material or to the manufacture thereof, and the Agent shall receive back without further charge, full, free, non-exclusive, non-divisible, non-transferable licenses * * *." Both licenses and agents were obligated to do everything possible to secure the rights to any inventions made by any of their employees. In fact, though some patents were offered by agents, Carboloy never accepted any.

In Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 1947, 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563, a clause requiring the licensee to assign over to the patentee any patentable improvements that might be made by the licensee was held not to be illegal, per se, but the Supreme Court remanded the case for an anti-trust finding. On remand, the arrangement was upheld, 2 Cir., 1947, 161 F.2d 565. In that case, however, the contracting parties were two relatively small concerns and were without an extensive control of market conditions. In remanding the case, Justice Douglas wrote [329 U.S. 637, 67 S.Ct. 616]: "We are quite aware of the possibilities of abuse in the practice of licensing a patent on condition that the licensee assign all improvement patents to the licensor. Conceivably the device could be employed with the purpose or effect of violating the anti-trust laws. He who acquires two patents acquires a double monopoly. As pat-

ents are added to patents a whole industry may be regimented. The owner of a basic patent might thus perpetuate his control over an industry long after the basic patent expired. Competitors might be eliminated and an industrial monopoly perfected and maintained. Through the use of patent pools or multiple licensing agreements the fruits of invention of an entire industry might be systematically funneled into the hands of the original patentee."

This point of view is also set forth in the opinion in United States v. National Lead Co., D.C., 63 F.Supp. 513, decided by Judge Rifkind in 1945, and affirmed by the Supreme Court in 1947, after the Transparent-Wrap case was decided. 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077. In the lower court opinion, one of the factors relied upon in condemning the arrangements between the leading producers in the field, was that they "applied to patents not yet issued and to inventions not yet imagined. * * * They embraced acknowledgment of patent validity with respect to patents not yet issued, nor applied for, and concerning inventions not yet conceived. * * *" [63 F.Supp. 524.]

 The trade position of the present defendants closely approximates that of the defendants in the National Lead case, and not that which is found in the Transparent-Wrap case. The employment of basic patents, or patents which may be basic, to compel the transfer of future patent rights, is condemned per se, when practiced on a scale such as is found in this suit. With regard to this question, there would seem to be no difference between licensing a patent with such a condition, and granting an agency conditional on such a clause.

4. *Resale price fixing.*

 Resale price-fixing is illegal even when the product is patented. Bauer & Cie. v. O'Donnell, 1913, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A.,N.S., 1185, Ann.Cas. 1915A, 150. In part, at least, Carboloy and the manufacturing licensees distributed their products through the medium of agents. The government contends that these agents were really purchasers, and that Carboloy's control of their selling prices amounted to resale price fixing. Defendants maintain that true agencies had been established. In my judgment, the evidence justifies a finding that the arrangement violated the prohibition against resale price fixing for two reasons: (a) the agents were really purchasers, and (b) the agents were competitors within the meaning of United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461.

Some of the carbide which the agents obtained from the manufacturing licensees was in the form of completed tools, dies, wear resistant parts, etc. The agents resold these articles without performing any work on them. The remaining portion of the supply obtained from the manufacturers was not in the form of completed usable products. Of this, a part was sold to users who made their own finished products. The remaining portion the agents themselves manufactured into finished products. As already noted, the labor going into such manufacture was estimated to be from one-half to two-thirds the value of the completed tool. Perhaps most of the tools thus made and sold by the agents were particular tools, that is, tools on which the price was not fixed for the completed product. However, many of them were not particular tools, but were price-fixed tools.

Having already held that it was unlawful for Carboloy to fix the price of a completed tool manufactured by one of the licensees who also manufactured the carbide material, I likewise conclude that when the manufacturing was performed not by a manufacturing licensee, but by a so-called agent, the arrangement was contrary to the statute.

The agency contracts contained the following clause: "The Agent is authorized to supply for the account of the Company such incidental labor and material as may be required to transform articles consigned hereunder into articles of any of the types and classes specified in Article 7 hereof." Article 7 specified the various categories of finished products the agent was allowed to make.

On cross-examination Robbins could not explain why the word "incidental" was used. He said: "I suppose you would say it is more than incidental. I don't know

how the incidental word happened to get in there." As a matter of fact, there was little or no difference between the operation of the "agency" system, and the manner in which control was exercised over the manufacturing licensees. Both groups followed Carboloy's estimates of average labor and material costs. These costs did not reflect the actual costs of the individual agent any more than they reflected the costs of the individual manufacturing licensee. Carboloy kept no record and exerted no control over the labor and costs of the agents. The agency arrangement, as applied to the manufacturing operations of the agents, was a pure sham, designed to invoke the rule of United States v. General Electric Co., 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, but came short of falling within its protection because of the nature of the agents' activities.

The agents did not perform manufacturing operations on all the material they handled. As already noted, they sold to users some unfinished material and some finished products. Having held that the unfinished material obtained for manufacture was purchased and not consigned, it perhaps follows that the unfinished material that was sold as such was also purchased, and not consigned, because the supplying manufacturing licensees never knew whether the material was to be used in the one way or the other. There are additional reasons for finding that in this respect also these were only simulated agencies.

The standard of United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, is not perfectly applicable on these facts. The article with which the court was there concerned was the incandescent lamp, which is a standard item. Cemented carbide blanks and finished products are not standard products. They come in a great number of sizes, shapes, and grades. Since an agent who ordered a large stock on consignment might never get an order for a great proportion of the items he stocked, the practice, with a few exceptions, was for agents to carry extremely small stocks, if they carried any at all. The common procedure was to obtain an order from a user before ordering the necessary carbide or carbide product from the manufacturing licensee.

Despite this circumstance, some agents did carry stock. Although there is evidence supporting the contrary view, I have concluded that the agencies were feigned, even with respect to material on which the agent in fact performed no manufacturing operations. Perhaps the controlling factor is that normally the principal, Carboloy or a manufacturing licensee, never knew whether or not the agent carried consigned stock. The real difference between this case and the 1926 one is that there the parties regulated their conduct by the contract, while here the so-called agency contracts were mere forms. Thus in both cases the contract provided a discount for prompt servicing. In the lamp case, the discount was truly for prompt servicing; here it was for purchase. The lamp agents remitted to the company the proceeds of lamps actually sold. The carbide agents paid for their "consignments" whether or not they had already sold the material. While the lamp agents kept stock in accordance with the directions of General Electric and sold only to those to whom the principal permitted them to sell, the carbide agents ordered what they wished and sold to whom they wished. Further, the principals in the lamp case kept accurate records of the outstanding consigned stock, and often shifted such stock from one agent to the other. The carbide agents were originally required to file monthly reports of their sales, but, beginning in 1937, it was provided that "The Agent's remittances to the Company will be regarded as reports of the sale or withdrawal (for use in the agent's plant) of the consigned articles remitted for." The early provision for a semiannual inventory was dropped in 1934. Also dropped in 1934, was the provision that upon termination of the agency all unsold goods were to be returned to the principal. While the 1937 contract did provide for a monthly report showing "all articles on hand on the last day of the previous calendar month covered by consignment invoices dated more than 60 days prior to the last day of the preceding calendar month and not sold or withdrawn for the Agent's own use," the Carboloy

Company did not make any checks or inspections to verify these reports. As Robbins testified: "We rely 100 per cent upon the agent's integrity."

Furthermore, these agencies, whether sham or not, are condemned by the rule of the Masonite case, supra.

In the Masonite case, patent differences were settled when formerly competing manufacturers all became del credere agents of the Masonite Company. The agents discontinued the manufacture of hardboard, and devoted themselves to the sale of hardboard manufactured by Masonite. The Court assumed that true del credere agencies had been established, but found, nevertheless, that the arrangement offended the Sherman Act. " * * * Doubtless there is a proper area for utilization by a patentee of a del credere agent in the sale or disposition of the patented article. A patentee who employs such an agent to distribute his product certainly is not enlarging the scope of his patent privilege if it may fairly be said that distribution is part of the patentee's own business and operates only to secure to him the reward for his invention which Congress has provided. But where he utilizes the sales organization of another business— a business with which he has no intimate relationship—quite different problems are posed since such a regimentation of a marketing system is peculiarly susceptible to the restraints of trade which the Sherman Act condemns. And when it is clear, as it is in this case, that the marketing systems utilized by means of the del credere agency agreements are those of competitors of the patentee and that the purpose is to fix prices at which the competitors may market the product, the device is without more an enlargement of the limited patent privilege and a violation of the Sherman Act. In such a case the patentee exhausts his limited privilege when he disposes of the product to the del credere agent. He then has, so far as the Sherman Act is concerned, no greater rights to price maintenance than the owner of an unpatented commodity would have. * * " [316 U.S. 265, 62 S.Ct. 1078.] In some instances, alleged infringers of one or more of the patents here involved settled

their differences with Carboloy by becoming agents of one of the manufacturing licensees, but this was not true of the great bulk of the agents. They never were competing manufacturers of carbide material as the agents in Masonite were competing hardboard manufacturers. Defendants claim that for this reason the Masonite rule does not apply. I think this would be so, were it not for the fact that the agents were competing manufacturers of completed carbide products.

Undoubtedly a high percentage of the agents were established tool manufacturers. If there was to be any competition in the sale of completed products, these companies had to be the source of such competition. By adopting the agency scheme Carboloy made it impossible for such competition to exist, except for particular tools. The evidence fully establishes that the Carboloy policy was not to permit the sale of carbide material to toolmakers for fabrication into non-particular tools for resale unless the tool-maker signed an agency agreement, and this policy was strictly enforced. The manufacturing licenses obligated the licensees to observe Carboloy's "prices, terms and conditions of sale" and "general sales rules." Further, several of the licenses explicitly required the licensee to observe the agency distribution system. The 1930 price manual also required it, and subsequent price manuals prohibited the sale of material for resale and not for the customer's own use. Consequently there can be no doubt that in this case, in contrast with the 1926 GE case, there was agreement to adopt the agency scheme.

In these circumstances, the agency system was just such an arrangement of potential competitors as was condemned in the Masonite case. There the patents were assumed to be valid, and hence the agents were no more free to compete with Masonite than the agents here were able to compete with the licensed manufacturers in the sale of carbide. The Masonite case turns on the loss of potential competition, and the present facts illustrate the evils at which that ruling was directed. There was no price competition in finished carbide products, except for parti-

cular tools. If the licensed family wished to utilize the resources of the numerous established tool-makers who became agents, it should have done so by selling them the blanks and nibs for fabrication.

In Masonite the conspiracy was between the patentee and the agents. Here the impetus behind the plan was the assent among Carboloy and its manufacturing licensees. The agents were more the victims of the scheme, than its instigators. However, I do not believe that this distinction is controlling. The gist of the Masonite case is that a patentee may not exploit his patent in this way. How willing his potential competitors may be, is immaterial. That the manufacturing licensees joined with the patentee but aggravates the restraint. It is enough that such agency contracts were made, that the agents knew they could not obtain the material without signing the contract, that they knew the contract imposed the price restraint, and that the contracts were made with potential competitors with a purpose and in a manner designed to prevent effectually price competition in the distribution of carbide products. Cf. the discussion below of Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610.

## 5. Boycott.

The Masonite case condemns the agreement among these potential competitors. I have mentioned the assent with the licensees to show that no tool-maker could obtain material without signing the contract. But this agreement among the licensees is also condemned itself, as an illegal boycott to prevent competition in the sale of unpatented tools. The Sherman Act condemns not only the horizontal boycott directed against a competitor's business, Fashion Originators' Guild v. Federal Trade Comm., 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949, but also the vertical boycott, directed at controlling the terms and manner of distribution of the subject article. United States v. Frankfort Distilleries, 1945, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; Paramount Famous Lasky Corp. v. United States, 1930, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; United States v. First National Pictures, Inc., 1930, 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151.

## 6. Territorial division of markets.

Under the 1928 Krupp-GE contract, Krupp was permitted to export, though the Government contends it tacitly agreed not to do so. The evidence shows that, in fact, GE only exported to South America and refrained from other exports. These export-import rights were cancelled in the 1936 contract, Krupp not being any longer permitted to import, or GE to export, except that Canada became GE territory. Of the five principal manufacturing licenses, four contained express prohibitions against exports, and a similar clause was contained in all the agency contracts.

It is the contention of the defendants that the German patents were basic, and that all the other patents were for improvements thereon. Assuming this to be so for the moment, and assuming that the parties might have been permitted to enter into a cross-licensing contract which divided territories as the 1936 contract did, what was done here would still be without justification. The 1928 contract licensed the basic patents. The 1936 contract was not really a cross-license at all but more a naked division of markets among two former competitors. Krupp had been importing into the United States; in the future it would refrain. GE had exported to some extent; in the future it would refrain. What Judge Rifkind said in the National Lead case, supra, [63 F. Supp. 523], is applicable here: "No citation of authority is any longer necessary to support the proposition that a combination of competitors, which by agreement divides the world into exclusive trade areas, and suppresses all competition among the members of the combination, offends the Sherman Act."

## 7. Purchase of competitors.

Carboloy purchased Morris Simons' Union Wire Die Company, and Thomas Prosser & Sons, for two reasons: (1) to effectuate the 1936 agreement removing Krupp from the U. S.-Canadian market, and (2) prevent the competition which Simons was able to offer aside from

his position as a Krupp outlet. Krupp agreed to the new contract only on condition that satisfactory arrangements were made with these two outlets. Further, Simons was manufacturing on his own account, and had available other sources of supply, so as to constitute a threat to Carboloy aside from his relations with Krupp.

The test governing the legality of such purchases was set forth in the recent opinion in United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, rehearing denied 1948, 334 U.S. 862, 68 S.Ct. 1525: "The same tests which measure the legality of vertical integration by acquisition are also applicable to the acquisition of competitors in identical or similar lines of merchandise. It is first necessary to delimit the market in which the concerns compete and then determine the extent to which the concerns are in competition in that market. If such acquisition results in or is aimed at unreasonable restraint, then the purchase is forbidden by the Sherman Act. In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market. We do not undertake to prescribe any set of percentage figures by which to measure the reasonableness of a corporation's enlargement of its activities by the purchase of the assets of a competitor. The relative effect of percentage command of a market varies with the setting in which that factor is placed." 334 U.S. at page 527, 68 S.Ct. at page 1124.

The record before me does not disclose the total amount of business done by Carboloy and the manufacturing licensees. There is no doubt, however, that Simons and Prosser did a proportionally large business. For the seven years preceding the sale, the two companies between them sold an average of 935,000 grams per year; in 1935 Carboloy sold 2,106,951 grams. Ac-

cording to defense counsel, total sales for the country in that year amounted to about 4,500,000 grams. Carboloy profits before taxes in 1936 were $406,422.48; Simons' profits were estimated to be at least $254,000 per year, and perhaps as high as $482,000.

The decisive factors are to be found in the fact that Simons was the only source of competition outside the price-fixed area, and that the prime intent and motive of the purchases was to remove this competition. Purchases under such circumstances, and for such a purpose, violate the law. Cf. United States v. Parker-Rust-Proof Co., D.C. Mich. 1945, 61 F. Supp. 805.

8. *Direct price fixing.*

The defendants engaged in direct price-fixing. I have already discussed in some detail the reasons why I have concluded that such agreements were reached with Morris Simons prior to the purchase of his business. That such agreements were not watertight contracts, so that it was not expected that Simons would abide 100% by the Carboloy price manual, does not save them. United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Socony-Vacuum Oil Co., supra. It is enough that the purpose and effect of such agreements was to preclude the possibility of a trade war that would have forced the Carboloy prices to come tumbling downward. Carboloy threatened such a war, but it never materialized. What prevented it was some degree of understanding between the parties.

Direct price-fixing was also revealed in the matter of the Heald Company. Heald manufactured tungsten carbide gauges which it was free to price as it wished. Appleton, of the Heald Company, wrote to Robbins, stating: "We are therefore passing them (these prices) along to you and if you feel that these prices are in line with your costs you will probably want to quote prices somewhat similar." Robbins thereupon instructed his salesman to tell Appleton that "we would be pleased to adhere to those prices." He cautioned, however, "that you will note from Mr. Appleton's

letter that he is apparently not familiar with the anti-trust laws," and instructed the salesman not to reply in writing but to tell Appleton "verbally" that Carboloy would adhere to Heald's prices. Robbins' explanation on the stand for this conduct was that Heald was a good customer, and that rather than antagonize a good customer Carboloy was willing to go along on the prices.

Adequate proof was also presented of two other practices which come within the price-fixing rule laid down in United States v. Socony-Vacuum Oil Co., supra. At one time, the sales manual prohibited the sale of large blanks, but this prohibition was subsequently removed because there was actually some industrial use for such pieces. However, at least one of the licensees developed a practice of selling large pieces to be cut into smaller ones. Since the manual prices were proportionally much lower for such large pieces, substantial savings could be effected in this way. Carboloy was much concerned about this threat to the price structure, and a gentleman's agreement was reached prohibiting the sale of large pieces for cutting. Similarly, it was always possible to offer price competition by submitting to a user a line of carbide products containing a smaller carbide content than the other sellers were offering. Since the manual was based on the size, a lower price could be offered without offending the manual. This practice was regarded as "chiselling," and it is clear from the record that much was accomplished in the way of reaching understandings to prevent it.

Defendants, by their counsel, have frankly admitted that they were monopolists, and that they sought to prevent price competition. In the course of the trial, Mr. Merritt said: "It is true that having acquired this grant of monopoly from the Germans it became our property, our monopoly, and we set out to treat it as our monopoly and prevent all competition in the field covered by the patents so far as price monopoly is concerned and to cut out all competition by way of unlawful infringement of our monopoly." The evidence clearly establishes that a price-fixing motive was largely responsible for many of the activities of the defendants. At the time of the first American Cuttings Alloys contract, Jeffries wrote Firth that "our first objective would be to bring the Cutanit material under price control." Regarding the Eisler license, Robbins wrote: "We feel that the signing of our license with Mr. Laise solved a serious price competitive problem." Robbins believed the most important advantage of purchasing Simons' business was that "an effective price control on all merchandise would immediately be possible." Discussing the second American Cuttings license Robbins wrote: " * * * As a result of these proposals we have been able to work out a license which puts him under price control on anything he manufactures, and as part consideration he has agreed to give up all of the contracts which he has temporarily negotiated with General Motors, Chrysler, and Ford. These contracts were designed to sell material lower than our manual prices and thereby seriously upset our apple cart." The record is replete with many similar declarations.

The eight illegal practices already discussed, especially when supplemented by the evidence to which reference has just been made, and when taken along with the character of the various licenses and agencies, and the course of dealing among all the parties, establishes beyond a reasonable doubt that defendants conspired among themselves to achieve a monopoly, and to fix prices in violation of the Sherman Act.

In Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 474, 83 L.Ed. 610, the Supreme Court laid down the test for proving a conspiracy under Section 1:

"While the District Court's finding of an agreement of the distributors among themselves is supported by the evidence, we think that in the circumstances of this case such agreement for the imposition of the restrictions upon subsequent-run exhibitors was not a prerequisite to an unlawful conspiracy. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in

it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. * * *

"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. * * * Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. * * *"

This reasoning applies to patent pool cases. In United States v. Masonite, supra, it was said there could be an unlawful conspiracy although: "the District Court found that in negotiating and entering into the first agreements each appellee, other than Masonite, acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others. It is not clear at what precise point of time each appellee became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement. But it is clear that as the arrangement continued each became familiar with its purpose and scope." See also United States v. United States Gypsum Co., supra, applying the same reasoning where manufacturing licenses were involved.

 In this view of the case, it is not necessary to find that defendants pooled independent competing patents. The monopolistic price-fixing scheme in which they were engaged is illegal regardless of the relation between the patents they accumulated. Standard Sanitary Mfg. Co. v. United States, supra, was a patent pool case in which it was found that the law was violated although the patents infringed. In United States v. Line Material, supra, the same result was reached in a cross-licensing case, and the rule also is found in Transparent-Wrap Machine

Co. v. Stokes & Smith, supra, which was remanded for an anti-trust finding. Standard Oil (Indiana) v. United States, supra, and United States v. National Lead Co., supra, are both patent pool cases in which it was held that the law had been violated. Neither case stressed the question of whether the patents were independent basic patents or not. In the Masonite case the court did not rely on the relation of the patents, noting rather that "The presence of competing patents serves merely to accentuate that tendency (to impair competition) and to underline the potency of the forces at work." A patentee may exploit his patent, but only by lawful means. He may, for instance, issue a manufacturing license in which he fixes the price of the patented manufactured product. But there are many paths of exploitation he may not pursue, including the eight that have heretofore been discussed. Moreover, he may not combine with others in a scheme, the purpose and intent of which is to clamp price control on an entire industry, horizontally and vertically, including patented and unpatented products. As was said in the Gypsum case [333 U.S. 364, 68 S.Ct. 544]:

"Patents grant no privilege to their owners of organizing the use of those patents to monopolize an industry through price control, through royalties for the patents drawn from patent-free industry products and through regulation of distribution. Here patents have been put to such uses as to collide with the Sherman Act's protection of the public from evil consequences. * * *

"The General Electric case affords no cloak for the course of conduct revealed * * *. That case gives no support for a patentee, acting in concert with all members of an industry, to issue substantially identical licenses to all members of the industry under the terms of which the industry is completely regimented, the production of competitive unpatented products suppressed, a class of distributors squeezed out, and prices on unpatented products stabilized. We apply the 'rule of reason' of Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.

1912D, 734, to efforts to monopolize through patents as well as in non-patent fields."

■ It is not a significant distinction that, practically speaking, in the present case the industry was born with and at the time of the initial license. As stated in United States v. United Shoe Machinery Co., 1918, 247 U.S. 32, 53, 38 S.Ct. 473, 480, 62 L.Ed. 968, "neither the letter of the law nor its purpose 'distinguishes between strangling of commerce which has been born and preventing the birth of a commerce which does not exist.'" Because the manufacturing licensees perhaps could not have entered the field without acceding to the Carboloy plan—and I make no finding on what the licensees really thought of the validity of the Carboloy patents—it does not follow that they could combine with Carboloy in a scheme the primary purpose and objective of which was industry-wide price control, which scheme was effectuated by a whole series of unlawful practices.

I turn now to the defenses urged upon me.

The major defense is based on the manner in which the indictment was framed. Paragraph 13 of the indictment sets forth ten "purposes and objects" in general terms. Paragraph 13(j) refers to "restraints, limitations and restrictions * * * as hereinafter set forth." Paragraph 14 in 19 subparagraphs occupying 24 printed pages sets forth the "means and methods" with particularity.

Defendants argue that paragraph 14 is to be included with paragraph 13 as stating the crime charged, and in particular, that paragraph 14c is part of the crime charged. 14c charges guilty knowledge, to wit: "As the defendants well knew, hard metal compositions made in accordance with certain of the letters patent contributed by General Electric and Carboloy to said patent pool would not have infringed the patents contributed thereto by Krupp insofar as they may have been valid," with similar averments concerning the Krupp patents and the sublicensees' patents.

Defendants draw two arguments from these pleadings. First it is said that the indictment charges a ten-purpose conspiracy, and that therefore it is necessary to prove almost all those purposes. "Of course, if just one of the ten purposes has not been established it might be a close question. But failure to establish nine of the purposes hardly leaves any room for doubt. The crime proven differs in character from the crime charged." It is claimed that at most one of the ten purposes was proved. Secondly, defendants claim that there can be no conviction without proof beyond a reasonable doubt that defendants "well knew" that they were combining independent competing patents. "If the Government is to prove a case it must prove that these defendants well knew that these patents were independent competing patents, and the first thing to prove is that fact. It is not so important as to whether they were or not as it is whether these defendants well knew that."

■ The first argument may be summarily rejected. Of the ten purposes alleged, defendants claim that seven would be lawful if incidental to a lawful patent monopoly, and of another, they say it would be lawful in part if protected under a proper patent structure. I have concluded that defendants did not, to use their term, possess a lawful patent structure, but an unlawful one. The activities complained of, dominating trade and commerce, pooling patents, limiting the number of persons who could engage in the trade, excluding others, fixing prices, forbidding export, etc. were sufficiently proved.

The second argument is the nub of the defense. It is my feeling that I cannot accept either of the two reasons that are presented in its support.

■ (1) The first reason is that paragraph 13 is not sufficiently particular to withstand demurrer, and that consequently resort must be had to paragraph 14c. Defendants admit that such resort is permissible under United States v. Waltham Watch Co., D.C.S.D.N.Y. 1942, 47 F. Supp. 524. This is a non sequitur. Because paragraph 14 must be referred to for particularity, it does not follow that 14c

must be referred to. Paragraph 14 occupies 24 pages.

(2) The second reason is that under the law of indictments 14c must be proved because it was averred. In support of this contention defendants cite two types of cases, i. e.—(i) Surplusage cases in which an averment was stated with greater particularity than is necessary to an indictment, and it was held the averment had to be proved. United States v. Howard, C.C. Mass.1837, 26 Fed.Cas. 388, No. 15,403; United States v. Brown, C.C.Ohio 1843, 24 Fed.Cas. 1265, No. 14666. (ii) A type of variance case, i. e., those where the proof made out a crime contained in the averments of the indictment, but not the particular statutory crime made out by all the averments of the indictment. Butler v. United States, 8 Cir., 1927, 20 F. 570, and perhaps United States v. Eisenminger, D. C.Del.1926, 16 F.2d 816.

In this circuit the law is not so strict in either surplusage cases, United States v. Lesser, 2 Cir., 1933, 66 F.2d 612; United States v. Groopman, 2 Cir., 1945, 147 F.2d 782, certiorari denied 1945, 326 U.S. 745, 66 S.Ct. 29, 90 L.Ed. 445, or in this variety of variance cases. United States v. Satuloff Brothers, 2 Cir., 1935, 79 F.2d 846; Maresca v. United States, 2 Cir., 1921, 277 F. 727, certiorari denied 1922, 257 U.S. 657, 42 S.Ct. 183, 66 L.Ed. 420. Moreover, the problem here is not one of variance between different statutory crimes at all. The question is not which one of two statutory crimes defendants are charged with, but what facts the government relies on to make out the statutory crime charged. It might well be a fatal defect to charge a crime under one section of the Criminal Code and prove a crime under another section, while it would not be fatal to prove a crime stated under a named section by proving all the particular averments except one. Kutler v. United States, 3 Cir., 1935, 79 F.2d 440 cited by defendants, does not hold otherwise. Moreover, the Supreme Court in cases involving variance of the proof within one crime has indicated its approval of the more liberal rule. Cf. Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Kotteakos v. United States,

1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, and has also done so in a case which may be construed as involving the surplusage problem. American Medical Ass'n v. United States, 1943, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434.

 Aside from the argument that guilty knowledge must be proven because pleaded, it is claimed that no substantive crime under the Sherman Act can be made out without such proof. I do not accept this view. The rules developed in Section 1 cases which do not involve patents apply as well to cases which do involve patents. Standard Sanitary Mfg. Co. v. United States, supra; National Harrow Co. v. Hench, 3 Cir., 1897, 83 F. 36; United States v. Masonite, supra; United States v. United States Gypsum Co., supra. The rule for Section 1 cases has been stated as follows: "In suits under Sec. 1 charging a restraint of trade, it is settled by authoritative pronouncement of the Supreme Court that wrongful intent need not be established by the Government and that good motives will not condone action in contravention of the statute." Handler, TNEC Monograph Number 38, page 78, footnote 81. See also United States v. Patten, 1913, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; United States v. Reading Co., 1912, 226 U.S. 324, 33 S.Ct. 90, 57 L.Ed. 243; Board of Trade of the City of Chicago v. United States, 1918, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, Ann.Cas.1918D, 1207; United States v. General Motors Corp., 7 Cir., 1941, 121 F. 2d 376, certiorari denied 1941, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497; United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915; United States v. L. C. Griffith, 1948, 334 U.S. 100, 68 S. Ct. 941. Further, there are patent pool cases under Section 1 containing explicit pronouncements on the question. Standard Sanitary Mfg. Co. v. United States, supra; United States v. United States Gypsum Co., supra; Standard Oil Co. (Indiana) v. United States, supra.

To the defendants' contention that it is harsh to punish them by a criminal conviction for their reliance on the grant given them by the Patent Office, the answer must be that the Patent Office grant did not

permit them to conspire together to abuse their patent rights in the manner revealed by this trial. See Nash v. United States, 1913, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

### Section 2 of The Sherman Act

So far as I am aware, this is the first criminal patent pool anti-trust case. It is therefore the first patent case in which the distinction between the various 'crimes within Sections 1 and 2 of the Act becomes of some importance.

The indictment charges three offenses under Section 2: conspiracy to monopolize (Count I); attempt to monopolize (Count III); and monopolization (Count II). I will first discuss Count II, monopolization.

There may be considerable difference between the issues in a monopolization case which does not involve patents, and one which does. In a case not concerned with patents the first, and perhaps major, fact issue, is whether the defendants possessed the necessary percentage of market control to constitute a monopoly. Assuming that the requisite size is present, a number of legal questions present themselves which have only been conclusively answered in very recent Supreme Court pronouncements. These include the problem of whether actual exclusion of competitors is necessary, whether it is necessary to achive the monopoly position by unlawful means, whether the monopoly position, once achieved, must have been abused, and what the requisite intent is. See United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416; American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

■ On the other hand, depending upon the type of patents, in a patent case there may be no question of whether defendants monopolized. Here the patents defined a whole new industry. The defendants admit to monopoly. The defense is that the monopoly was lawful, coming within the protection of the patent grants. Decision must turn on whether or not the patent privilege has been misused. Although in a non-patent case exclusion, unlawful achievement, and abuse of monopoly power may not need to be proved, elements of such conduct are

necessary in a patent case before Section 2 may be invoked.

At the same time, Section 2, in a patent case, is distinguished from Section 1 by the same criteria which distinguish the two sections in a non-patent case. In a famous footnote in United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 845, 84 L.Ed. 1129, Justice Douglas wrote: "But the crime under § 1 is legally distinct from that under § 2 * * * though the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1." In the American Tobacco case Justice Burton wrote [328 U.S. 781, 66 S.Ct. 1128]: " * * * we have here separate statutory offenses, one a conspiracy in restraint of trade that may stop short of monopoly, and the other a conspiracy to monopolize that may not be content with restraint short of monopoly. One is made criminal by § 1 and the other by § 2". See also United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941.

■ Assuming patents of the variety here in suit, which define a whole new industry, in this type of case the distinction between the sections is the degree of success attained by way of these unlawful business practices. The present defendants used their patents as a lever to win domination over the entire cemented carbide business. The total absence of price competition, coupled with defendants' price-fixing practices, are the sure signs of monopoly control. Competitors were excluded by purchase and by boycott, prices on unpatented products were fixed, resale prices were fixed, future patent rights were forced into the pool, world markets were divided, and on occasion prices were fixed beyond the scope of any asserted patent protection. Furthermore, many other restrictive practices were employed, such as a Supervision Bureau and numerous threats of infringement suits. It can not be argued that defendants' position in the industry was thrust upon them, and I do not think it can be maintained that their position was justified by the patents they owned. Section 2 does not permit a patentee to use his patents to combine an entire industry under his price-fixing regime, unlawfully controlling both the manufacture and distribution of

the patented product. See United States v. United States Gypsum Co., supra. Defendants did unlawfully monopolize.

It is established that to make out the crime of actual monopolization it is not necessary to prove specific intent "in the sense in which the common law used the term," but "It is sufficient that a restraint of trade or monopoly results as a consequence of a defendant's conduct or business arrangements." United States v. Griffith, supra [334 U.S. 100, 68 S.Ct. 944]. See United States v. Aluminum Co. of America, supra. Turning now to Count III, the attempt to monopolize, the important distinction is that here specific intent is necessary. As was said in Swift & Co. v. United States, 1905, 196 U.S. 375, at page 396, 25 S.Ct. 276, at page 279, 49 L.Ed. 518: "Intent is almost essential to such a combination, and is essential to such an attempt." See also United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, at page 431.

Thus while there can be actual monopolization without any purpose or intent to create a monopoly, so long as "monopoly results as a necessary consequence of what was done", United States v. Paramount, supra [334 U.S. 131, 68 S.Ct. 937], there can be no attempt without a specific intent to create a monopoly. What this means is that defendants must have done certain things with monopoly as their objective, which, if performed without the requisite intent, but with complete success, would have resulted in actual monopolization. This also serves to distinguish the required intent from that guilty knowledge that they were pooling independent competing patents which defendants argued had to be proved before they could be convicted under Section 1. It is not necessary that they were aware they were pooling competing patents, so long as they knew what they were doing, and did it with the intent to create a monopoly. Since I have found that defendants' primary purpose was a system of price-control that ranged over the entire cemented carbide industry, and since I have also found them guilty of actual monopolization, it is clear that they must also be found guilty on the count of attempted monopolization. In addition to the factors already discussed, and which support these conclusions, confirmation thereof is to be found in several practices appearing in the record, and which were not relied upon as indicia of illegality under Section 1. These include the private policing system, United States v. Eastman Kodak, D.C.W.D.N.Y.1912, 226 F. 62, 78, the numerous infringement suits, and the discriminatory practices complained of in paragraph 24f of the indictment, which avers that Carboloy discriminated even against its co-conspirators, a charge which was substantially supported by the record.

Count I requires the same proof of intent as does Count III, except that it is a conspiracy count while Count III charges attempt. I find this count also sufficiently well established, for reasons apparent from the conclusions reached in the other three crimes.

The Supreme Court has suggested in American Tobacco Co. v. United States, supra, that conviction on all four counts does not involve double jeopardy. While that was not a patent case, I believe the reasoning is applicable in this prosecution. In the course of the opinion I have spelled out what I believe are the different elements going into the different crimes. No two are the same.

## The Wilson Tariff Act.

Count V charges violation of Section 73 of the Wilson Tariff Act of 1894, 15 U.S. C.A. § 8. That section reads in part as follows: "Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into

which such imported article enters or is intended to enter."

There is very little authority on the construction of the section, and none on the nature of the requisite intent. However, defendants have not argued that they may be acquitted on this count, although convicted under the Sherman Act counts, and I do not think there can be any doubt but that the statute applies. As stated in United States v. General Dyestuff Corp., D.C.S.D.N.Y.1944, 57 F.Supp. 642, 648, the statute "makes explicit the prohibitions of the Sherman Act in the field of foreign commerce." See United States v. Sisal Sales Corp., 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042.

It follows that I must adjudge each of the defendants to be guilty of each and all the charges made against them.

If counsel at their mutual convenience will call at my Chambers I will fix a time for the sentencing of the defendants.